Frederick B. TAYLOR, Kenneth W. Bergen, Christopher Hurd, and Howard F. Taylor, Plaintiffs,

v.

John B. JANIGAN, Defendant.

Civ. A. No. 58-1056.

United States District Court
D. Massachusetts.

Dec. 31, 1962.

Harold M. Willcox, Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., for plaintiffs.

Robert W. Meserve, John R. Holly, Sarkis M. Zartarian, Boston, Mass., for defendant.

CAFFREY, District Judge.

This is a civil action brought by former owners of the common stock of Boston Electro Steel Casting, Inc. (Besco), against John B. Janigan, who, early in 1956, purchased from plaintiffs substantially all of the common stock of Besco as part of one overall transaction. At the time of the purchase, defendant was President, General Manager, and a member of the Board of Directors of Besco. Jurisdiction of this Court is invoked under the provisions of Section 10 of the Securities and Exchange Act of 1934 (15 U.S.C.A. § 78j).

As will be set out at length *infra*, it is the position of plaintiffs that defendant is liable to them because of his alleged violations of S.E.C. Rule 10b–5 in the circumstances surrounding his acquisition of the stock formerly owned by the plaintiffs.

The factual background which gives rise to this controversy is as follows: Besco was and is a corporation organized under the laws of the Commonwealth of Massachusetts, and does business at a foundry located in the Roxbury district of Boston, Massachusetts. Its business was the manufacture and sale of steel castings which were made only upon receipt of orders from customers. It did not at any time relevant to this case manufacture steel castings and place them in inventory against the possibility of their later sale. Stated another way, its production was directly responsive to orders already in hand.

In April 1952, defendant Janigan commenced his employment as President and General Manager of Besco. During the term of his office with that corporation he devoted himself exclusively and energetically to the management of the company. He worked long days and full weeks, supervised all of the company affairs, and drastically reduced costs and overhead. Over a period of time he reduced personnel from 160 to 35 employees and dispensed with all members of the office staff save himself and his brother-in-law, Harold P. Donn, an accountant. All the company books and records, financial and otherwise, were in the control of the defendant and all entries therein were made either by the defendant or Donn.

Janigan was well-qualified by reason of his background and experience to assume the duties of manager of Besco. He had training in accounting, had earned a graduate degree at the Harvard Business School, and had experience in analyzing small businesses for purposes of buying and selling them. By reason of his extremely close application to the operation of Besco, he became intimately familiar with every material detail of all phases of its business. This familiarity extended to manufacturing, matters of personnel, and particularly to matters of sales and finance. During the relevant years an audit of the financial records of Besco was made at the close of each fiscal year (September 30) by a firm of independent auditors, Lybrand, Ross Bros. & Montgomery. Janigan was the sole source of information relative to the financial condition of the company available to the members of the Board of Directors or the shareholders over and above the auditors' annual report.

The Board of Directors met at regular intervals and the usual practice at these meetings was for Janigan to furnish the directors with interim financial statements covering the month immediately past. At these Board meetings Janigan regularly commented about the state of the company's business and the significance of the information contained in the various financial reports. From time to time he advised the Board with regard to the general status of the business or the status of its relations with a particular customer or customers, depending upon the importance of that customer's business to Besco. He further reported to the Directors with regard to changes in the level of incoming orders, including details about important orders, about the volume of plant activity, and about the existence or non-existence of a backlog of unfilled orders from time to time. He likewise commented with regard to the probable effect of these various changes in the business picture on the financial condition and financial future of Besco.

Janigan's close familiarity with these various aspects of the business derived from the fact that he actually placed the price on all orders as they came in; from the fact that he filed the orders in the open-order file; from his use of that file in the course of ordinary operations; from his visual inspection of casting operations in the foundry and from his visual inspection of casting patterns that had been put out in the pattern room preparatory to their later use in the foundry; from reports made to him by his salesmen and from conversations he had with various customers of Besco; from a so-called day to day statistical book; and last but by no means least from what he described as his "general feel" of the business which, he said, always made him "feel confident you know where you're going as every business man does."

During the period from 1952 to the time of the sale which is the subject matter of the instant litigation, the various reports made by Janigan to the Directors with regard to the state of the company's business were proven accurate by subsequent events, as defendant himself admitted during the course of the trial. I find that over a period in excess of four years, Janigan's performance as President and General Manager of Besco had favorably impressed the Board of Directors and, in fact, indicated a high degree of executive skill on his part. Because of the previously proven accuracy of his various statements as to probable changes and trends in the business, the Directors had every reason to repose, and did repose, trust and confidence in the truth of factual representations made by him about Besco in the latter half of 1956 and early 1957.

During the calendar years 1953 and 1954, Besco experienced a decline in its sales volume and in the amount of unfilled orders on hand, which reached its nadir in the fall of 1954. By that time monthly sales had fallen off to about $25,000, with a corresponding decline in unfilled orders or backlog. This occasioned Janigan to report to the Directors that the company was on a two or three week delivery basis. Starting about this

797

time and consistently thereafter, again and again at various meetings of the Board of Directors Janigan emphasized to the Board the fact that because of the age, if not the actual obsolescence, of plant and machinery, the financial future of Besco was at best doubtful, unless fresh capital could be introduced into its operation for the purpose of modernizing plant and equipment, so that once having rid itself of its archaic manufacturing potential, it might thereafter improve the quality of its castings and thus compete on more even terms with its competitors. Janigan painted the business picture with a very black brush.

In 1955, on several occasions Janigan reported that the business was and apparently would continue running with small but steady losses, which would fluctuate up to about $2,000 a month. In October 1955, he told the Board that the company could "rock along" indefinitely in this fashion since it was not impairing its capital position but was suffering only paper losses (i. e., depreciation losses). During 1955 and 1956 it could fairly be said that the only optimistic note he struck was contingent upon introduction of substantial amounts of fresh capital to improve the equipment. He stressed to the Directors that absent this · fresh capital (which continued to remain unobtainable) the financial picture was, at best, a very dark gray.

During the year 1955, interim accounting statements did not indicate an uptrend nor did the September 30 fiscal year-end report so indicate. There had been an apparent profit in May because certain bills incurred therein were deferred until a later month. Because book sales were high due to the shipment of large amounts of inventory, the monthly interim reports for October and November showed total sales figures that were about twice those of the corresponding months in 1954. However, monthly and annual losses continued to be reported.

At the trial Janigan testified that he did not observe in this data any indication of a future uptrend nor did he comment with regard thereto to the Directors. He also testified that he did not report to the Directors that any "firming" of prices had occurred despite an announced price increase in August, because he considered that price rise merely an offset to the increased cost of labor. During the course of the trial he somewhat grudgingly qualified this position and near the end of the trial admitted that he saw in the above-described accounting data a somewhat "volatile" indication of an uptrend and that this had been among the factors he considered when he made his offer. I find that his realization that the accounting data may have indicated an uptrend, however "volatile," was never communicated by Janigan to the Board of Directors at any time prior to their acceptance of his offer.

In the fall of 1955, on the basis of reports furnished with substantial regularity by Janigan, all of which can fairly be characterized as pessimistic, the Board of Directors voted to· call a special stockholders meeting for the specific purpose of considering whether or not the company should be sold or liquidated. This action of the Board was in large part the result of reports from Janigan to the effect that the company was "rocking along" with small but regular monthly losses; that Besco could not fairly compete in the trade on even terms with its rivals because of its old and faulty equipment which necessitated a product of oftentimes inferior quality; and that without substantial additional capital to modernize the equipment (no likely source for which was then known), the company might well "go under" at some undetermined future time. The stockholders had not been paid a dividend for many years.

I find that the position of the Board of Directors, both individually and collectively, premised on these pessimistic reports from Janigan, was that they should call the unhappy financial plight of the company to the attention of the shareholders and seek their authorization to

make intensive efforts to sell or liquidate the company before a more disastrous financial consequence was visited upon it. I find that a special meeting of the shareholders was held in November of 1955; that Janigan made substantially the same report as to the need for fresh capital to modernize the plant and equipment and the correlative lack of a source of fresh capital; and that at the meeting, on the basis of these reports, the shareholders authorized the Directors to make every reasonable attempt to sell the business and to consider liquidation if a sale could not be successfully consummated. I further find that no serious offer to buy the company was forthcoming, and that on December 27, 1955 Janigan made an offer to the Board of Directors to buy the common stock of Besco at $20.00 per share. I find it significant that his offer was made in a form which made swift, if not precipitate, acceptance by ninety per cent of the shareholders and all members of the Board of Directors who were shareholders, a condition of the offer. The offer also was conditioned upon director-shareholders notifying all other shareholders that they themselves had accepted Janigan's offer and recommended its acceptance by all shareholders.

I find that Janigan withdrew from the meeting, that the Directors considered his offer for approximately one-half hour, and upon his return to the meeting a colloquy occurred between Attorney Kenneth Bergen, a member of the Board of Directors, and Janigan, the substance of which was testified to as follows by Bergen at the trial in answer to questions put by counsel for plaintiffs, Mr. Willcox:

"Q. Was there, following the consultation which the directors had, a period when a question or questions were directed to Mr. Janigan?

"A. There was.

"Q. Who directed a question or questions to Mr. Janigan?

"A. I directed a question to Mr. Janigan.

"Q. What was your question and what was his answer?

"A. I asked at the end of the meeting whether Mr. Janigan knew of any material change in the affairs of the company or in the past months, which could cause us to have any different opinion about the company.

"Q. And his reply?

"A. His reply was, there was none, it was about the same."

On December 28, 1955, an escrow agreement was signed by various members of the Board of Directors and the substance of Janigan's offer was transmitted by use of the United States mails to all stockholders together with the Board's favorable recommendation. Two weeks later, on January 11, 1956, the sale to Janigan of 1876 out of 1936 shares of stock was consummated; and in February 1956 Janigan purchased 20 shares from Howard F. Taylor, et ux., and 20 shares owned by Professor John Wulff. In negotiating with Taylor and Wulff in February 1956, Janigan repeated the statement previously made to the Board of Directors that the business of the company was substantially the same as it had been and was still losing money.

In early 1958, Janigan contacted Attorney Bergen telephonically and informed him that he had made an agreement to sell the company for approximately $700,000, i. e., for about $300.00 a share, and requested Bergen to represent him in connection with his resale of the business. Bergen declined, and subsequently Bergen and Taylor requested and received permission from Janigan to examine the books of the company. Following this examination the instant complaint was filed in October 1958.

It is the contention of the plaintiffs that at the time they sold their shares in Besco to the defendant they did so on his representation to the Directors that the condition of the company was then the same as it had been in the last few preceding years, i. e., in a condition of sustaining small but regular losses, with

the prospect of continuing so to do indefinitely into the future. It is likewise the position of plaintiffs that this representation was factually false. They contend that Janigan's answer to Bergen's question was a misrepresentation and that had he disclosed all the information available to and known by him about the current status of the company's affairs, they could have made an independent determination that things were not then the same as they had been in the two years immediately past. Plaintiffs say that had full disclosure of this material information as to Besco's true economic condition been made, they would not have sold their stock to Janigan. They likewise say that Janigan, as an expert in buying and selling businesses, the central executive of the company, the sole keeper of the books and records, and the *de facto* entire executive force of the company, was an insider in every sense of the word, who knew perfectly well the condition of Besco from day to day and at all times material to this case.

Defendant's position is that as a matter of law there was no failure on his part to disclose to the Board of Directors any material fact about the business of Besco known to him at the time Bergen addressed the question to him at the Directors meeting on December 27, 1955. Defendant also says that as a question of fact plaintiffs have failed to sustain their burden of proof in this regard and have not established either that there was a material change in the business of Besco on or shortly prior to December 27, 1955 or that if there was such a change it was known to defendant; and that if any facts were known to defendant and not disclosed by him to the Directors these facts were not material for purposes of this case and that the non-disclosure, if any occurred, is not actionable under Rule 10b-5 or any other applicable rule of law.

On the basis of the facts set out above, I find that at the time he was questioned with reference thereto by Bergen, the defendant John B. Janigan had knowledge of and wilfully failed to disclose to the Board of Directors the existence of material facts about the state of the business of Besco, and the existence of facts which indicated still further changes were so imminent that they should have been disclosed to the Board, namely, the fact that on December 27, 1955, the business of Besco had actually developed into a condition of then unrealized but potentially large and immediate profit, prices in the industry having firmed and business on hand having doubled in the last three months and quintupled in the past year. The latent profits of December 27, 1955 later appeared on the books of the company as large actual profits for January and February 1956 and, in fact, truthful and accurate records for December 1955 would have shown a small profit.

Janigan likewise knew that the 33¢ per pound price for inventory which had been applied by the auditors as of September 30, 1955, was not used in computation of profits for October, November or December 1955, and he knew that different figures were used for those months, each of which tended to minimize the profits and increase the deficit. He knew of the fact that negotiations for the sale of certain land considered excess to Besco's needs had progressed to the point where the buyer had at least orally indicated a willingness to pay $40,000 cash therefor, and he was familiar with a multitude of reports from his salesmen and from Besco customers which indicated that the customers' business had already improved markedly and that a similar improvement in Besco's affairs was imminent.

I rule that not only did Janigan know these material facts but I also rule that by reason of his training and experience he knew them to be material to forming the business judgment and to making the business decision that the Board of Directors of Besco were called upon to make by his offer to purchase the stock of Besco. He knowingly failed to disclose these material facts to the Board because their concealment had a tendency to bring about the acceptance by the Board of the offer which he had just submitted. His awareness of the materiality of this

business information—particularly with regard to the changes in the backlog of orders—appears clearly from the fact that he himself brought similar information to the attention of officials of the R.F.C. at a time when he was endeavoring to stave off threatened foreclosure of a mortgage held by the R.F.C.

I find that Janigan's attempted explanation under questioning by counsel for plaintiffs (R. pp. 454–457) as to why he thought these figures would be of interest to the R.F.C. was meaningless equivocation on his part, double-talk intended to avoid what he knew to be a responsive answer, namely, that the increase in backlog of unfilled orders was the business equivalent of an increase in sales and augured a brighter sales future for Besco. It is obvious and elementary economics that information as to an increase in probable sales in any going business is information that is relevant and material to any potential buyer or creditor of that business, as the defendant himself admitted when pressed by the Court as to why he submitted sales data to the R.F.C.

I find that Janigan was not a truthful witness either during the taking of his deposition or while testifying in Court. Specifically, I disbelieve his denials of knowledge of the firming of prices and increase of backlog in late 1955 and, not believing his denials of such knowledge, I find that he did know about them at the time he told Bergen that things were just about the same. Cf. National Labor Relations Board v. New England Web, Inc., et al., C.A. 1, 309 F.2d 696 (1962); and Labor Board v. Walton Mfg. Co., 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962), to the effect that "the demeanor of a witness ' * * * may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story.' "

I further find that the price per pound entered on the books under the heading "Inventory" for the months of October, November and December 1955, was deliberately changed from the 33¢ per pound price attributed to inventory by the auditors as of September 30, 1955.

Neither the defendant nor his brother-in-law, Donn, would admit which of them made these arbitrary changes or why. Having in mind that these changes operated to decrease the profits for the months to which they applied, and having in mind the fact that only Donn, who acted under the defendant's direct supervision, or the defendant himself, could have and did make these changes, and considering that if they were made for any innocent reason the innocent explanation would have been offered at the trial by either defendant or Donn, and, finally, considering that no explanation emanated from either, I find that these changes were made by or under the supervision of the defendant for the purpose of worsening the profit picture for the months involved.

I find that the so-called "error" in posting sales of about $4,630 which took place on December 30, 1955, over to the month of January 1956, was not done innocently, but was done to insure that if in response to the offer to purchase the stock the Directors called for and received the financial statement for the month of December, the purpose of calling for that statement would be thwarted, since the effect of this deliberate misposting was to convert the month of December 1955 from a month showing a profit of $3,400 to a month which according to the records as tampered with reflected a loss of $6,240. In short, I find that not only were material facts known by defendant not disclosed to plaintiffs but also, that certain manipulation of the corporate books took place to insure that if plaintiffs went beyond reliance on defendant's untruthful answer to Bergen's question and investigated the business records of Besco, that investigation would be frustrated by false entries.

I rule that plaintiffs have sustained the burden of proving their case by a preponderance of the evidence and that the facts as set out above state a cause of action under Rule 10b–5. This case is indistinguishable in principle from Kardon v. National Gypsum Co., 73 F. Supp. 798 (E.D.Pa.1947), and Speed v. Transamerica Corp., 99 F.Supp. 808 (D.

Del.1951); 135 F.Supp. 176 (D.Del. 1955), aff'd 235 F.2d 369 (3 Cir. 1956). See Northern Trust Co. v. Essaness Theatres Corp., 103 F.Supp. 954 (N.D. Ill.1952).

To the extent that requests by either party for findings are not allowed by incorporation in the statement of facts contained in this opinion, they are denied.