John B. JANIGAN, Defendant, Appellant,

v.

Frederick B. TAYLOR et al., Plaintiffs, Appellees.

No. 6410.

United States Court of Appeals First Circuit.

Heard Jan. 5, 1965.

Decided May 4, 1965.

Harold Lavien, Boston, Mass., with whom Joshua A. Guberman and Brown, Rudnick, Freed & Gesmer, Boston, Mass., were on brief, for appellant.

Harold M. Willcox, Boston, Mass., with whom Charles C. Cabot, Jr., Boston, Mass., was on brief, for appellees.

Before ALDRICH, Chief Judge, SWEENEY, Chief District Judge, and WYZANSKI, District Judge.

ALDRICH, Chief Judge.

■ This is a personal action brought by plaintiffs as a class in the district court for the district of Massachusetts in which they allege violations by the defendant of Rule 10b–5 (17 C.F.R. § 240, 10b–5) of the Securities and Exchange Commission promulgated pursuant to section 10 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j), hereinafter the Act. The cause of action arises by implication of the Act. Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 631–633, 37 A.L.R.2d 636. The basic facts are simple. The plaintiffs are former stockholders, some of whom were also the controlling directors, of Boston Electro Steel Casting, Inc. (BESCO). For convenience they will be called stockholders, directors, or, collectively, plaintiffs. The defendant was the president, general manager and a director of BESCO. In early 1956, following a directors' meeting on December 27, 1955, defendant purchased plaintiffs' stock (virtually all of the outstanding stock of the company) for approximately $40,000. In December 1957 he sold it for $700,000. Suit was brought in October 1958. Plaintiffs' action rests upon a statement by the defendant admittedly made at the December 27 meeting in response to a question by one of the directors.[1] Asked whether he "knew of any material change in the affairs of the company or in the past months which could cause us to have any different opinion about the company," his answer was, "[T]here was none, it was about the same." For convenience we will call this the representation. Trial was had without jury. The district court found the representation consciously and materially false and, to the degree hereinafter set forth, that plaintiffs relied on it, and awarded as damages defendant's net profits. Defendant appeals. All events took place in Massachusetts and it is agreed that its law governs to the extent that federal law does not.

■■ At the threshold is the question whether plaintiffs' action was brought too late. Although other sections of the Act have attached provisions for limitation of action, there is none here applicable. Hence the state statute applies. Campbell v. City of Haverhill, 1895, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280. This is two years. Mass.G.L. c. 260 § 2A. More than two years had elapsed since the representation and sale before the present suit was brought. In light of this, plaintiffs claim the benefit of Mass.G.L. c. 260 § 12 under which the statute of limitations is tolled if the cause of action has been fraudulently concealed. The tolling statute, however, requires some affirmative act of concealment except, apparently, where there is a duty to

---

1. Plaintiffs have not contended, and we do not need to decide, that the Act imposes a general duty to make disclosures beyond and apart from disclosures needed to render entirely truthful all affirmative statements which have been made. For a comprehensive discussion see List v. Fashion Park, Inc., 2 Cir., 1965, 340 F.2d 457, 461–462 pet'n for cert. filed sub nom. List v. Lerner, Mar. 30, 1965; cf. Kohler v. Kohler Co., 7 Cir., 1963, 319 F.2d 634.

disclose imposed by a fiduciary relationship. Stetson v. French, 1947, 321 Mass. 195, 198–200, 72 N.E.2d 410, 173 A.L.R. 569; Old Dominion Copper Mining & Smelting Co. v. Bigelow, 1909, 203 Mass. 159, 201, 89 N.E. 193, 40 L.R.A.,N.S., 314. The sole case which plaintiffs cite for the contrary position, Brackett v. Perry, 1909, 201 Mass. 502, 87 N.E. 903, in no way supports it.

■■ Absent special circumstances, an officer or director has no fiduciary duties in purchasing or selling stock under Massachusetts law. Goodwin v. Agassiz, 1933, 283 Mass. 358, 361–363, 186 N.E. 659; Gladstone v. Murray Co., 1943, 314 Mass. 584, 587, 50 N.E.2d 958. Nor has he at federal law. See Strong v. Repide, 1909, 213 U.S. 419, 431–433, 29 S.Ct. 521, 53 L.Ed. 853. Hence, unless we should decide that the effect of the Act is to establish new fiduciary relationships, fn. 1, supra, plaintiffs show nothing entitling them to the benefit of the Massachusetts tolling section under either the general rule or the exception.

■■ It is unnecessary to interpret the Act in order to toll the statute of limitations. Federal law has long been established, with more liberality than that of Massachusetts, that where fraud is involved the cause of action is, so-to-speak, automatically concealed, and does not arise until discovery. Bailey v. Glover, 1875, 21 Wall. 342, 22 L.Ed. 636; Traer v. Clews, 1885, 115 U.S. 528, 6 S.Ct. 155, 29 L.Ed. 467. Bailey v. Glover was said to apply equally to actions "at law" and "in equity" in tolling federal statutes of limitations. 21 Wall. at 349. Holmberg v. Armbrecht, 1946, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743, extended the doctrine to toll a state statute of limitations where the cause of action was federal in origin and equitable. We are in considerable sympathy with Judge Friendly's opinion in Moviecolor Ltd. v. Eastman Kodak Co., 2 Cir., 1961, 288 F.2d 80, 90 A.L.R.2d 252, cert. den. 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26, to the effect that the Holmberg decision should be applied to state statutes of limitation where the cause of action is federal in origin and cognizable solely in federal courts, whether the cause of action be regarded as "legal" or "equitable," concepts which have lost much of their meaning in federal practice. Without deciding how far we would carry this principle we hold that federal law must determine the date of accrual here even though the period of limitation thereafter is determined by state law.

■■ Turning to the merits, the defendant makes a massive attack upon the court's findings that his representation was false, and that it was consciously so. We will deal first with the latter findings because defendant's criticism of one aspect of them has at least superficial merit. The court stated,

"I find that Janigan was not a truthful witness either during the taking of his deposition or while testifying in Court. Specifically, I disbelieve his denials of knowledge of the firming of prices and increase of backlog in late 1955 and, not believing his denials of such knowledge, I find that he did know about them at the time he told Bergen that things were just about the same." 212 F.Supp. 794, at 800.

Defendant argues that this was a violation of the principle that disbelief of testimony does not of itself constitute a basis for finding the opposite. Although the temptation to do so may be strong, see Dyer v. MacDougall, 2 Cir., 1952, 201 F.2d 265, 269, however satisfied a court may be from the witness's demeanor or his demonstrated untruthfulness in other respects that certain testimony is false, it cannot use such disbelief alone to support a finding that the opposite was the fact. See Moore v. Chesapeake & Ohio Railway Co., 1951, 340 U.S. 573, 576–577, 71 S.Ct. 428, 95 L.Ed. 547; Nishikawa v. Dulles, 1958, 356 U.S. 129, 137, 78 S.Ct. 612, 2 L.Ed.2d 659. The reason must be obvious. Were the rule otherwise a case could be made for any proposition in the world by the simple process of calling one's adversary

and arguing to the jury that he was not to be believed.

Whatever the arguable meaning of the court's language we do not think that it intended to adopt such a fallacy. Rather, we take its statement as a roundabout way of saying that the evidence of the material facts, and of defendant's access thereto and connection therewith, was such that it would infer full knowledge on defendant's part unless it believed his profession of ignorance, and that not so believing, this inference controlled. On this basis the sole question is the correctness of the underlying findings.

The district court's considerable number of subsidiary findings, if well founded, warrant its conclusion that defendant's representation was materially false. In the main we find them supported by the evidence. The plaintiff became president and general manager of BESCO in April 1952. BESCO was a steel foundry doing, exclusively, a special order business. It was, accordingly, peculiarly dependent upon its customers and upon a steady influx of orders. In addition, its plant was old and relatively inefficient and its financial position poor. New capital was needed, and none was obtainable. Rather, the company was in trouble with an R.F.C. loan. The directors left the company's affairs almost exclusively to the defendant, and accepted the validity of his reports of current conditions, which were generally pessimistic. However, we think the finding that they were "all" pessimistic is open to question. The indications in the court's opinion that the company sustained a loss every month were incorrect.[2] On the contrary, it is quite clear that the business measurably fluctuated.

In the fall of 1955 the directors called a stockholders meeting for the purpose of considering sale or liquidation. The defendant opposed the call of the meeting. It also seems clear that no misstatement by him, and no failure to disclose, brought about the meeting, or the decision reached that a sale should be attempted. This, however, is not determinative. The question is what happened thereafter. One month after the stockholders meeting the defendant made an offer himself and the representation in question. Essentially the representation was false because there had been a firming of prices and an increasing backlog of orders such that the first quarter of 1956 could be expected by defendant, due to his detailed knowledge, to show a profit. Furthermore, the court found various changes in practice with respect to pricing of inventory, and actual alterations to conceal an improvement in profits.[3]

Viewed against a background of past fluctuations, we might not find the misrepresentation to be of the importance intimated by the court's opinion. Certainly it could not be claimed that the change presaged the dramatic improvement that occurred subsequently in the company's affairs, or that the defendant could have any thought that it did. On the other hand, even as a new upswing not uncharacteristic of the business, plus some promising overtones, we could not find that as a matter of law the true situation was fairly disclosed, within the heavy requirements of the Act, by the single statement that things were "about the same."

The defendant argues that the court made no finding that the plain-

2. For example, the court referred to "an apparent profit in May [1955] because certain bills incurred therein were deferred" to June, suggesting that the true May balance should have been a deficit. Actually, had these bills not been deferred there would have been a profit in both months, rather than in neither. On this basis the undisclosed profit in the fall of 1955 was of smaller over-all significance in the sense of indicating a change.

3. Defendant is correct that since the bookkeeping changes occurred only after the making of the representation, and were not seen by the plaintiffs, they could not have been relied on. However, they were admissible as casting light on the defendant's state of mind, and, very possibly, to affect his credibility.

tiffs relied upon defendant's representation. Under any interpretation of the Act this is a necessary condition. List v. Fashion Park, Inc., supra, fn. 1, 340 F.2d at 462–464. It is quite true that the court made no finding of reliance *in haec verba*. However, it stated in one portion of its opinion that over the years the directors reposed "trust and confidence" in what defendant told them about the company and did so "in the latter half of 1956 and early 1957." (sic) It further found that it was "elementary economics that information as to an increase in probable sales in any going business is information that is relevant and material to any potential buyer," and that the defendant "knowingly failed to disclose * * * material facts to the Board because their concealment had a tendency to bring about the acceptance by the Board of the offer which he had just submitted." We think it fairly and adequately implicit in the court's findings, in toto, that it found reliance upon the representation.[4]

■■■ We turn to the remedy. With respect to damages we draw a distinction between cases where, by fraud, one is caused to buy something that one would not have bought or would not have bought at that price, and where, by fraud one is induced to convey property to the fraudulent party. In the former case the damages are to be reckoned solely by "the difference between the real value of the property at the date of its sale to the plaintiffs and the price paid for it, with interest from that date, and, in addition, such outlays as were legitimately attributable to the defendant's conduct, but not damages covering 'the expected fruits of an unrealized speculation.'" Sigafus v. Porter, 1900, 179 U.S. 116, 125, 21 S.Ct. 34, 37, 45

L.Ed. 113. See Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 10 Cir., 1962, 303 F.2d 527, 533; Securities Exchange Act of 1934, 15 U.S.C. § 78bb; 3 Loss, Securities Regulation, p. 1793 (2d ed. 1961).[5] On the other hand, if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them. See Marcus v. Otis, 2 Cir., 1948, 168 F.2d 649, 660, 169 F.2d 148. We may accept defendant's position that there was no fiduciary relationship and that he was dealing at arm's length. Nonetheless, it is simple equity that a wrongdoer should disgorge his fraudulent enrichment. Falk v. Hoffman, 1922, 233 N.Y. 199, 135 N.E. 243 (per Cardozo, J.); 4 Scott, Trusts §§ 507, 508, 508.1 (2d ed. 1956); Restatement, Restitution §§ 151, 202, Comments b, c (1937); See Dickson v. Patterson, 1896, 160 U.S. 584, 16 S.Ct. 373, 40 L.Ed. 543; cf. Speed v. Transamerica Corporation, D.C.D.Del., 1955, 135 F.Supp. 176, 186–193, modified on other grounds, 3 Cir., 1956, 235 F.2d 369; Kardon v. National Gypsum Co., D.C.E.D.Pa., 1947, 73 F. Supp. 798, modified, 83 F.Supp. 613.

4. It must be conceded that the court said even less with respect to the plaintiffs who were not directors. However, the court did find that defendant's "offer also was conditioned upon director-shareholders notifying all other shareholders that they themselves had accepted Janigan's

offer and recommended its acceptance by all shareholders."

5. We note, without more, the broader view suggested in Rice v. Price, 1960, 340 Mass. 502, 164 N.E.2d 891. Accord, Restatement (2d), Torts § 549 (Tent. Draft No. 10, 1964.)

There are, of course, limits to this principle. If an artist acquired paints by fraud and used them in producing a valuable portrait we would not suggest that the defrauded party would be entitled to the portrait, or to the proceeds of its sale. However, those limits are not reached in the case at bar. In answers to interrogatories defendant stated that following the acquisition he did nothing different, and worked no harder than he had before. In his pretrial memorandum he stated that the company's "turn-around" was due to price rises, increased efficiency, and an improvement in the business cycle particularly affecting BESCO's customers. Since defendant received his salary for his personal efforts, which would have been his regular duty, no extraordinary gains in the company's affairs attributable to himself fall within the principle suggested by our artist hypothetical.

There is, however, one exception that we should take note of. The plaintiffs admitted, in fact volunteered, at the hearing on damages that had there been no misrepresentation and no sale the defendant could properly have expected to continue to receive a 10% bonus on net pretax profits under a plan established in 1952, and accepted the figure therefor of $41,567. We agree with the Court's rejection of certain other claims of the defendant as "purely speculative," but we regard such characterization of this one improper. The burden was on the plaintiffs to show that there would have been a change, and they did not even seek to meet it. This disallowance was unjustified.

We have considered defendant's other points, but do not find them to require comment.

Judgment will be entered remanding the case to the District Court to modify the judgment consistently with the penultimate paragraph of this opinion, but otherwise affirming its judgment. Costs to appellees.