David O. RUDE, Administrator C.T.A. of the Estate of William S. Reese and Clarice Reese Banks

v.

CAMBELL SQUARE, INC., a corporation, et al.

No. CIV75–5007.

United States District Court, D. South Dakota.

March 26, 1976.

George A. Bangs, Rapid City, S. D., for plaintiff.

Richard O. Sharpe, Rapid City, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge.

### FACTS

This is an action brought under SEC Rule 10b–5, 17 C.F.R. § 240.106–5, alleging fraud in the purchase of stock of a closely-held corporation.

On October 1, 1964, William S. Reese and Jerry G. Brodsky agreed to form a corporation to be known as Cambell Square, Inc. for the principal purpose of developing and renting land. The corporation issued 400 shares of common stock at a par value of $100.00 per share. William S. Reese was issued 202 of those 400 shares in return for: a $10,000.00 note; the personal property, good will and trade name of a business known as Cambell Square which he had formerly operated; and a lease on certain realty known as the Cambell Square property. The lease was for a twenty-year term beginning February 1, 1962, and provided for rent of $150.00 per month in addition to taxes and assessments. At the expiration of the twenty-year term, the lease was renewable at Reese's option for a term of from one to ten years. The lease agreement also gave Reese an option to purchase the property for $25,-000.00 at the close of the twenty-year term. Reese was permitted under the terms of the lease to make improvements on the property, and he assigned his leasehold to Cambell Square, Inc. along with improvements he had made on the property. While making these improvements he had incurred liabilities of $26,768.90, and his interest was assigned subject to these liabilities. Two of the 202 shares he received in return for his contributions were later given by him to his wife Clarice H. Reese, one of the plaintiffs in this action. (Although Mrs. Reese has subsequently remarried, she will be referred to as Mrs. Reese throughout this opinion for purposes of simplicity.)

Jerry G. Brodsky contributed $5,000.00 cash, some real property with an agreed value of $10,000.00, and a $5,000.00 note. In return he received 198 of the 400 shares of $100.00 par common stock issued by Cambell Square, Inc.

The notes executed by both Mr. Reese and Mr. Brodsky were secured by a lien which the corporation, pursuant to its bylaws, had on the stock issued them.

Jerry G. Brodsky, William S. Reese and Clarice H. Reese, the incorporators of Cambell Square, Inc., held an organizational meeting October 9, 1964 at the Reese home. The three elected themselves directors for one-year terms, with Brodsky as chairman and Mr. Reese as secretary. On the same day, the Board

of Directors held their first meeting. Brodsky was elected president and Mr. Reese was elected secretary-treasurer. Although the bylaws of Cambell Square, Inc. gave Brodsky as president general supervision over corporate affairs and other officers, the testimony of the principal parties to this action reflects that Mr. Reese was largely responsible for the management of Cambell Square, Inc. As secretary-treasurer his principal duty was imposed by the requirement that he sign all checks and other bank withdrawals. Each check and withdrawal slip also required the counter-signature of Brodsky as president. Mrs. Reese was elected vice-president, an office with undefined duties. Upon motion of Mrs. Reese, Brodsky and Mr. Reese were empower to act as an executive committee to manage the corporation's business between board meetings. Otherwise the corporate bylaws vested the management of Cambell Square, Inc. in its Board of Directors.

The Cambell Square property which had been contributed by William S. Reese was unofficially platted and subdivided into ten lots of varying size and shape. The first of these lots was rented in January of 1965 to a business known as S & S Beer Shop for $150.00 per month. Included in the rental was the use of a building which Mr. Reese and Brodsky had constructed prior to the formation of Cambell Square, Inc. The second rental occurred in June of 1965, to Rapid Traveler Service, and was also at a monthly rate of $150.00. In September of 1966 a third lot was rented at $150.00 per month to Club 1410, which also operated in a building previously constructed by Mr. Reese and Mr. Brodsky.

Mr. Reese died in the spring of 1966. His holographic will, which was admitted to probate, left all of his property to Mrs. Reese. David O. Rude, one of the plaintiffs in this action, was appointed administrator c. t. a. of Mr. Reese's estate. The record does not reflect any immediate formal changes in the corporate structure of Cambell Square, Inc.,

although it is clear that Brodsky became the principal manager of the business. He kept the corporate records at his office. He did all the banking, although Mrs. Reese's counter-signature was deemed necessary for all checks and other withdrawals. Mrs. Reese's role in management was limited to countersigning checks and a promissory note of Cambell Square, Inc., and meeting with Brodsky on a monthly basis when he came from his home, then in Grand Island, Nebraska for the primary purpose of obtaining her counter-signature. Since she was the only corporate officer then living in South Dakota, she did receive service of process in some unspecified lawsuits brought against Cambell Square, Inc. The record does not reflect what disposition if any was made in any lawsuit against the corporation. She also attempted to help Brodsky in rent collections on behalf of the corporation, but her almost total lack of business experience and her meek and confused demeanor as a witness at the trial of this case reflect that her assistance in rent collection would have been of dubious value. Although she has a high school education, she had not been employed prior to her husband's death, and she has no training or experience in business matters.

On April 8, 1969, Brodsky came from Grand Island for one of their monthly meetings. At this meeting Mrs. Reese indicated that she was in need of money, as she had been since her husband's death, and was interested in selling her shares of stock. Brodsky told her that Cambell Square, Inc. was in bad financial shape, and that the stock was practically worthless. He did not tell her how much money the corporation had on hand, did not furnish a corporate balance sheet, and did not mention any plans for developing the Cambell Square property or discuss the potential of the property for development. On April 8, 1969, Clarice Reese transferred her two shares of stock to Adelaide M. Brodsky and Michael C. Brodsky, the wife and son of Jerry G. Brodsky. She also assigned to

Jerry G. Brodsky her "legal rights and equity" in the 200 shares which remained in the name of her late husband. She also sold some of Mr. Reese's personal property, such as office furniture, to Jerry Brodsky. In return Brodsky agreed to pay her a total of $1,400.00 cash and pay $600.00 in Mrs. Reese's dental bills. It should be noted that at this time the $10,000.00 of William S. Reese to Cambell Square, Inc. had not been paid. Some of the cash price which Brodsky agreed to pay was paid April 8, 1969, and at least one subsequent installment in the form of a check was mailed to Mrs. Reese. There is a dispute over both the time and form of payment of the dental bills. Mr. Brodsky testified that he gave Mrs. Reese cash with which to pay them, while Mrs. Reese testified that she understood that Brodsky was to pay her dentist himself, and that the bills remained unpaid as late as 1972. In any event the transfer of the 202 shares was effected on April 8, 1969. The 200 shares formerly held in the name of William S. Reese were subsequently retired by Cambell square, Inc. The two shares formerly held by Clarice H. Reese were retained by Adelaide and Michael Brodsky.

At a meeting purportedly held in October of 1969 (the minutes were prepared in 1972 and both Adelaide and Michael Brodsky, who were present according to the minutes, testified that they had no role in Cambell Square, Inc. before 1972) Cambell Square, Inc. had 200 shares of common stock then outstanding. 198 of these were held by Jerry Brodsky, and one each was held by Adelaide and Michael Brodsky. At this meeting the resignation of Clarice H. Reese as officer and director was accepted, Jerry Brodsky was elected president, Michael Brodsky was elected vice-president and Adelaide Brodsky was elected secretary-treasurer. Jerry Brodsky's purchase of the 202 shares of stock was approved and ratified, and the 200 William Reese shares were officially retired and became treasury stock.

During its first years of existence, Cambell Square, Inc. (as portrayed by an unaudited and uncertified accounting provided by defendants pursuant to an order of this Court) was operating at a loss. Defendants' unaudited income statement for its 1969 accounting period shows gross income of $5,126.00 in rents, but a net loss of $767.00 after deductions for amortization, depreciation, insurance, interest, accounting expense, rent, repairs and maintenance, taxes, returned checks and bank charges. Its unaudited 1969 balance sheet lists assets totalling $59,050.00, liabilities of $27,778.00, and stockholders' equity of $31,272.00 after deducting an $8,728.00 retained earnings deficit. Between 1969 and 1975 the rental income of Cambell Square, Inc. did not substantially increase since by 1975 it had only five lots rented in four parcels (one composed of two lots), each rented at a rate of $150.00 per month. On the other hand, Cambell Square, Inc. does not incur substantial expenses beyond taxes and insurance.

In 1972, however, the commercial potential of the Cambell Square property which had originally been contributed by William S. Reese began to be realized. In January of 1972 an automobile dealership indicated an interest in buying one of the lots on the property. Cambell Square, Inc. was able to accelerate its purchase option on the entire piece of property for $45,000.00. This was a convenient price, since a portion of one of the ten lots was sold to the automobile dealership for $45,000.00. An additional $10,000.00 needed to clear the title to the entire property was acquired by the sale of 100 shares of Cambell Square, Inc. stock to Michael Brodsky. In 1973 the auto dealership bought the remaining portion of its lot for $7,000.00, and an additional lot for $20,000.00. That same year an equipment and implement company paid $37,500.00 for one of the lots.

A review of the current status of the Cambell Square property shows that, of ten lots, three have been sold for an aggregate price of $109,500.00, five lots are rented for a gross monthly income of $600.00, and two lots are vacant. In his testimony, Jerry Brodsky estimated that the lots still owned by Cambell Square,

Inc. have a total fair market value of $120,000.00. Plaintiff's expert values the remaining lots as of January, 1975, at a total fair market value of $187,747.00. It is clear that the property has risen substantially in value since April of 1969 when Mrs. Reese sold her shares, and her interest in her husband's shares, to Jerry Brodsky. Defendants' expert testified that, in his opinion, the total value of the Cambell Square property including improvements was $65,200.00 in April of 1969.

In recent years the capital structure of Cambell Square, Inc. has undergone a few changes. It now has 776 shares outstanding. Jerry Brodsky has received compensation in the form of stock to give him a total of 674 shares. Michael Brodsky holds 101 shares and Adelaide Brodsky still has one share. Jerry Brodsky remains president and principal manager as demonstrated by a Directors' Resolution of September 2, 1972, issuing compensation stock in recognition of his managerial services, particularly in "arranging for the exercise of the option and acquisition of a considerable piece of very valuable property [the Cambell Square property]."

Plaintiffs brought this action on January 28, 1975 seeking an accounting of the corporate defendant, damages equalling the difference between the price paid for the stock and the highest value of a proportionate share of the outstanding stock, and punitive damages. While the complaint sought an alternative remedy of rescission, this claim was abandoned before the September 24, 1975 trial. Rescission was no longer sought because of the change in capital structure, and because Cambell Square, Inc. has not filed a federal income tax return since 1968 and plaintiffs wished to avoid becoming stockholders in light of that fact.

## JURISDICTION

The jurisdictional predicate for an action brought under Rule 10b–5 is proof of "use of any means or instrumentality of interstate commerce or of the mails." Here the actual transfer of stock took place within South Dakota, but the subsequent installment payments involved the use of the mails. The use of mails need not be in actually transmitting the fraudulent representation to establish federal jurisdiction for a Rule 10b–5 action. *See Boone v. Baugh,* 308 F.2d 711 (8th Cir. 1972). This Court finds that the mails were used to make further payments for the stock, and that such use of the mails was in furtherance of the alleged fraud. *Myzel v. Fields,* 386 F.2d 718, 728 (8th Cir. 1967), *cert. denied* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Thus this Court assumes jurisdiction over the subject matter of this action.

## STATUTE OF LIMITATIONS

The transaction upon which the complaint is based took place on April 8, 1969. The complaint was filed January 28, 1975. The parties in their trial briefs presented this Court with two possible limitations periods: The first is found in S.D.C.L. § 47–31–137, which in effect gives a purchaser three years from the date of sale within which to bring an action to void the sale under South Dakota's Blue Sky Laws. The second is S.D.C.L. § 15–2–13(6), which creates a six-year limitations period for actions for relief on the ground of fraud. A third possibility urged by the parties is the S.D.C.L. § 15–2–13(2) limitation period of six years for actions on liabilities created by statute. Since federal law controls the matter of tolling of a statute of limitations, *e. g. Tomera v. Galt,* 511 F.2d 504 (7th Cir. 1975), there is no difference for purposes of this action between South Dakota's six-year limitations period for fraud and its six-year limitations period for statutory liability. Consequently the issue here is confined to a choice between the South Dakota Blue Sky Law three-year limitations period for a stock purchaser's rescission action, and the six-year limitations period for fraud in South Dakota.

It should be noted that defendants in their Proposed Findings of Fact and Conclusions of Law have apparently

abandoned their argument for the three-year limitations period. They argue that the transaction took place sometime in 1968, and that the action is therefore barred under any limitations period. However, the written transfers were executed on April 8, 1969 and, although the parties' memory of the dates is at times somewhat inconsistent and uncertain, the evidence presented, particularly the execution date shown on the transfer documents, points to the 1969 date. In short, this Court finds that Mr. Brodsky purchased the Reese shares on April 8, 1969. Although defendants are not now strenuously urging an adoption of the three-year statute of limitations, the issue is nevertheless raised and this Court is constrained to review the effect of *Vanderboom v. Sexton*, 422 F.2d 1233 (8th Cir. 1970), *cert. denied* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970) upon Rule 10b–5 litigation in the District of South Dakota.

*Vanderboom, supra,* was an action brought by a defrauded purchaser under the provisions of Rule 10b–5 in the Western District of Arkansas. Since Arkansas law supplied the applicable Statute of Limitations, a review of Arkansas law was necessary to determine which Arkansas statute best effectuated the federal policy at issue. The Court of Appeals in *Vanderboom* first reaffirmed the rule in this Circuit that recovery may be had under Rule 10b–5 upon a showing of negligence, and identified the federal policy at issue in that light. A recovery for fraud in Arkansas required a showing of scienter or intent to defraud. Arkansas Blue Sky Law, however, made a seller liable for a misstatement of material fact where the purchaser did not know of the falsity of the representation and the seller failed to demonstrate his or her own lack of knowledge and further failed to demonstrate that the exercise of reasonable care would not have disclosed the falsity of the representation. The Eighth Circuit Court of Appeals concluded that the Blue Sky Law, rather than the law of fraud, provided the appropriate Statute of Limitations.

The *Vanderboom* rationale was followed in *Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d 123 (7th Cir. 1972), where allegedly defrauded stock purchasers were held to a three-year limitations period derived from Illinois Securities Law. The Court in *Parrent* noted that Illinois Securities Law, unlike Rule 10b–5, was directed only toward the protection of purchasers, *Parrent,* 455 F.2d 123 at 126 n. 7, but chose the Blue Sky Law's Statute of Limitations because neither it nor Rule 10b–5 as construed in the Seventh Circuit required a showing of scienter.

In the case of *Hudak v. Economic Research Analysts, Inc.,* 499 F.2d 996 (5th Cir. 1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975), the *Vanderboom* approach was used in applying to a suit by defrauded purchasers a two-year Statute of Limitations under a Florida statute substantially identical to Rule 10b–5.

It should be noted that the *Vanderboom* approach of comparing causes of action has not been universally followed. The Court in *United California Bank v. Salik,* 481 F.2d 1012 (9th Cir. 1973), *cert. denied* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973) opted for a longer Statute of Limitations lifted from California fraud law, relying primarily on a need to fully effectuate the broad remedial policy of Rule 10b–5. The Court did not compare the elements of Rule 10b–5 actions in the Ninth Circuit with fraud actions in California, and instead approached the issue as a matter controlled by dictates of policy. It viewed a continued utilization of the California fraud statute of limitations as preferable to a piecemeal adoption of California Blue Sky Law because of a perceived need to avoid uncertainty in the law. Other courts, however, have followed the *Vanderboom* approach in particular factual situations and concluded that a given fraud statute provided the appropriate limitations period. *E. g. Mitchell v. Texas Gulf Sulphur,* 446 F.2d 90, 103–104 (10th Cir. 1971) *cert. denied* 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); *Klapmeier v. Peat, Mariwick, Mitchell & Co.,* 363 F.Supp. 1212 (D.Minn.1973).

The impact of *Vanderboom* has been far-reaching. Apart from the enlightened approach to the selection of a limitations period established by *Vanderboom*, it appears that *Vanderboom* constitutes a rejection in this Circuit of a policy generally favoring a longer limitations period to implement the remedial policies of Rule 10b–5. *See Klapmeier v. Peat, Marwick, Mitchell & Co.,* 363 F.Supp. 1212, 1219 (D.Minn.1973); *Nickels v. Koehler Management Corporation,* 392 F.Supp. 804, 808 (N.D.Ohio 1975); *compare Berry Petroleum Company v. Adams & Peck,* 518 F.2d 402, 409 (2nd Cir. 1975); *United California Bank v. Salik,* 481 F.2d 1012 (9th Cir. 1973), *cert. denied* 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973).

Within the framework of the foregoing discussion of *Vanderboom* and its progeny, this Court must examine relevant South Dakota law to determine, through a comparison of causes of action, which South Dakota limitations period best effectuates the federal policy behind Rule 10b–5.

South Dakota's law of securities regulation is contained in Chapter 47–31 of the South Dakota Compiled Laws. While most of that chapter is concerned primarily with registration of securities and brokers, some of its provisions are concerned with fraudulent transactions and these provisions apparently draw no distinction between registered and unregistered securities. *See* S.D.C.L. § 47–31–128, 129, 130 and 131. Of these provisions, however, only § 128 is by its terms and broad enough to protect a seller as well as a purchaser. It reads as follows:

It shall be a violation of the provisions of this chapter for any person to engage in any transaction, practice or course of business in the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

While S.D.C.L. § 47–31–128 has been construed to impose criminal liability without a showing of intent or scienter, *State v. Martin,* 85 S.D. 587, 187 N.W.2d 576 (1971), there is no indication that South Dakota courts view § 128 as creating a cause of action for a defrauded seller of securities. The only civil action expressly created in S.D.C.L. § 47–31 is found in S.D.C.L. § 47–31–131 *et seq.,* which allows a purchaser to void a sale made in violation of Chapter 47–31. S.D.C.L. § 47–31–137 sets up a three-year limitations period within which such a purchaser's rescission action must be initiated.

Within the facts of the instant case, the obvious difficulty with the S.D.C.L. § 47–31–137 limitations period is that it applies only to a purchaser's action. Indeed, the bulk of S.D.C.L. § 47–31 is directed toward the protection of purchasers, either through registration or prohibition of fraudulent sales methods. Rule 10b–5, on the other hand, expressly applies to both purchasers and sellers, and unquestionably creates a civil cause of action for members of either of those classes. *See Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Further, relief under Rule 10b–5 is not limited to the rescission afforded by S.D.C.L. § 47–31–131, *et seq. See Myzel v. Fields,* 386 F.2d 718, 740–749 (8th Cir. 1967). In short, S.D.C.L. § 47–31–131, *et seq.,* although it is concerned with securities regulation, creates a significantly narrower cause of action than that created by Rule 10b–5.

The law of fraud in South Dakota is not without some confusion. South Dakota case law consistently characterizes intent to deceive as an element of a fraud action. *See, e. g., Northwest Realty Company v. Colling,* 82 S.D. 421, 147 N.W.2d 675 (1967); *Life Benefit, Inc. v. Elfring,* 69 S.D. 85, 7 N.W.2d 133 (1942). An action for fraud or deceit is recognized in S.D.C.L. § 20–10–1, which reads:

One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

S.D.C.L. § 20–10–2(2) somewhat broadens the definition of fraud by including:

The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.

Arguably this provision allows a *prima facie* case of fraud to be established without a showing of actual intent to deceive, since it indicates that an untrue statement unreasonably made is fraudulent. The nature of the fraud alleged in the instant case appears to closely resemble that envisioned by S.D.C.L. § 20–10–2(2), since Brodsky asserted to Mrs. Reese that the Cambell Square, Inc. stock was practically worthless. Unfortunately, no judicial constructions of S.D.C.L. § 20–10–2(2) exist. This Court is thus left with the South Dakota case law which, as noted above, declares unequivocally that intent to deceive is an essential element of recovery based on fraud.

From the foregoing comparison of South Dakota's Blue Sky and fraud laws, it is apparent that neither of the two limitations periods would be entirely appropriate. In the judgment of this Court, South Dakota's Blue Sky Law's limitations period for purchaser's rescission actions is the least appropriate of the two. As a practical matter, nothing in South Dakota's scheme of securities regulation either creates or allows for actions such as this. The situation in the instant case parallels that found in *Toledo Trust Company v. Nye*, 392 F.Supp. 484 (N.D.Ohio 1975), where the Court rejected an effort to apply an Ohio Blue Sky Law limitations period to an action by a seller, relying on the fact that Ohio Blue Sky Law did not provide for a seller's action. *Compare Nickels v. Koehler Management Corporation*, 392 F.Supp. 804, 809 (N.D.Ohio 1975).

This Court adopts the reasoning of *Toledo Trust Company v. Nye, supra,* and holds that the six-year limitations period in S.D.C.L. § 15–2–13(6) is more appropriate to this action under the *Vanderboom* test. The instant action was timely commenced, and this Court may now turn to the merits of the claim.

## VIOLATION OF RULE 10b–5

This Court begins its scrutiny of the April 8, 1969 transaction with an examination of the respective positions of the parties involved. *See Nanfito v. Tekseed Hybrid Co.*, 473 F.2d 537 (8th Cir. 1973). Unlike the seller in *Nanfito*, Mrs. Reese was almost completely ignorant of the dealings, status and prospects of Cambell Square, Inc. Although she had been an officer and director of the corporation, it is clear that she left its management entirely in the hands of her husband and Jerry G. Brodsky. After her husband's death, her involvement increased nominally insofar as she then became the only officer capable of executing the counter-signature for checks which was required by the corporate bylaws. Her knowledge of the affairs of Cambell Square, Inc. must be characterized as very general at best. She had no educational or empirical background which would support any other inference respecting her knowledge of the corporate business.

Her knowledge of the holdings of Cambell Square, Inc. is likewise limited. She knew that the Cambell Square property existed, but this Court can only find that she had no idea what proportion of it had been rented, or what efforts if any had been or could be made to rent the remaining area. She was not furnished with a corporate balance sheet at the time of the transaction with which to survey the book value of the stock. In short, the evidence generally supports Mrs. Reese's testimony that she knew nothing about the business at all beyond the general facts that some rental income was made and some debts incurred.

Mrs. Reese testified that, after her husband's death, she became confused and was in need of money. She had not worked at all prior to his death, and had grown accustomed to relying on him for both a livelihood and the management of their affairs.

After Mr. Reese's death, Brodsky became the principal manager of Cambell Square, Inc. Since *its* inception, however, he had always taken a very active

role in its management. It is apparent that Mrs. Reese came to rely on him for the management of Cambell Square, Inc.

At the time of the transaction, Mrs. Reese did not request the information which she herself did not possess. In the opinion of this Court, she placed her trust and confidence in Jerry Brodsky, and took his general representation (*e. g.* the stock is practically worthless) at face value. At the time of the transaction, her reliance on him for business judgment was unquestioning, since she was so lacking business experience and the evidence did not reveal any other person she relied on for financial advice at that time.

In reviewing the representations made by Brodsky to Mrs. Reese, *i. e.* that the stock was practically worthless since the corporation was in bad financial condition, and his failure to discuss the nature and value of the assets, the amount of land as yet unrented and the development potential of the land, this Court finds that these representations and omissions were material within the meaning of Rule 10b–5. They clearly involve facts which would reasonably affect both the value of the shares, and Mrs. Reese's decision to sell them at that time. *Myzel v. Fields*, 386 F.2d 718, 734 (8th Cir. 1967); *Securities & Exchange Commission v. First American Bank & Trust Co.*, 481 F.2d 673, 681 (8th Cir. 1973).

The Eighth Circuit Court of Appeals has outlined the relevant factors which must be considered in determining the value of stock in a closely held corporation such as Cambell Square, Inc. These factors must be examined in the context of a willing seller and willing buyer. They include: the corporation's original capital, the profit or loss in business, the assets and liabilities, the future prospects, the nature of the business engaged in, the nature of any competition and the skill of the management. *Myzel v. Fields*, 386 F.2d 718, 745–746 (8th Cir. 1967). In light of the relative positions and knowledge of the parties, and the confidence which Mrs. Reese placed in Brodsky, these factors should have been carefully discussed with her. Brodsky's failure to do so, in the judgment of this Court, constitutes a violation of Rule 10b–5.

With respect to the future prospects of Cambell Square, Inc. as of April 1969, there is sufficient evidence in the record to warrant a finding that its future prospects were good enough to have merited more discussion than Brodsky's statement that the corporation was in bad financial shape and that its stock was practically worthless. Defendant's expert, in appraising the value of the Campbell Square property as of April, 1969, cited as a basis for his opinion three commercial sales of comparable property located near Cambell Square. The existence of these sales, which occurred in and before 1969, indicates that commercial growth was proceeding into and beyond the Cambell Square area. While it is true that the severe Rapid City flood of June, 1972 heightened commercial interest in the Cambell Square area, it should be noted that the first offer to purchase a portion of the Cambell Square property came in January of 1972, some six months before that unforeseeable disaster.

In short, Brodsky's failure to discuss fully all factors relevant to the April 8, 1969 value of Cambell Square, Inc. stock, particularly his failure to discuss the reasonable future prospects of the business, constitutes a material misleading omission within the meaning of Rule 10b–5. Further, his representation that the stock was practically worthless is an actionable violation of Rule 10b–5. This Court simply cannot find that Brodsky fairly disclosed, within the heavy requirements of Rule 10b–5 the true situation to Mrs. Reese before the transfers were completed. *See Janigan v. Taylor*, 344 F.2d 781, 785 (1st Cir. 1965).

Plaintiffs in this action seek to impose liability upon Cambell Square, Inc., Jerry G. Brodsky, Michael C. Brodsky and Adelaide Brodsky. In the judgment of this Court, plaintiffs have estab-

lished liability on the part of Jerry Brodsky since he was the person who actually made the misrepresentations and misleading omissions. This liability extends to Cambell Square, Inc. Brodsky testified that he was acting on behalf of the corporation at the time of the purchase. The corporation, through its Board of Directors, subsequently ratified the purchase. The 202 shares acquired through Brodsky's efforts were retired, and two new shares were issued to replace the stock formerly owned by Mrs. Reese. These facts are sufficient to establish the liability of Cambell Square, Inc. *See Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 740–741 (10th Cir. 1974).

■ However, plaintiffs have failed to establish the liability of Michael and Adelaide Brodsky. Each of them credibly professed a thorough lack of knowledge of the affairs of Cambell Square, Inc. prior to 1972. *Compare Zabriskie v. Lewis*, 507 F.2d 546 (10th Cir. 1974).

In summary, this Court finds that plaintiffs have established a cause of action against Jerry Brodsky and Cambell Square, Inc., and now turns its attention to the question of relief.

RELIEF

■ Initially, this Court finds that the circumstances of this case warrant the measure of damages based on defendants' gain as established in *Janigan v. Taylor*, 344 F.2d 781 (1st Cir. 1965), cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). This measure has been approved and articulated by the United States Supreme Court as follows:

. . . the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct, except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit. (Citations omitted) *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972).

The use of the higher measure of damages, then, must be predicated primarily upon a finding that defendants Brodsky and Cambell Square, Inc. received more than Mrs. Reese lost in the transaction. *See Opinion Sur Petition for Rehearing* in *Rochez Brothers, Inc. v. Rhoades*, 491 F.2d 402 at 414 (3rd Cir. 1974).

Since the April 8, 1969 transaction the value of a 51% interest (the proportionate interest acquired from Mrs. Reese) in the stock of Cambell Square, Inc. has increased substantially through the acquisition of the Cambell Square property and subsequent sale of some parcels of the property. The corporation acquired title to the entire piece of land at a cost of $55,000.00, and has since sold three of the ten lots for a total price of $109,500.00. Through the April 8, 1969 transaction and the subsequent increase in value of the assets of Cambell Square, Inc., defendants have realized significant gains in that the April 8, 1969 transfer eliminated any dilution of gains and profits outside the Brodsky circle. These gains are clearly in excess of the amount plaintiffs lost, computed on the basis of the value of the stock as of April 8, 1969.

■ The primary limitation upon the rule established in *Janigan, supra*, arises in the situation where the defendants' gains have been realized largely through his or her own special efforts to such an extent that it would be unjust to award them to a plaintiff. *Rochez Brothers, Inc. v. Rhoades*, 491 F.2d 402, 413 (3rd Cir. 1974). In the judgment of this Court, this limitation is inapplicable to the instant case. The gains realized by Cambell Square, Inc. and Jerry Brodsky are primarily attributable to a natural commercial growth and the windfall in commercial development occasioned by the 1972 flood. This is a case where "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965) cert. denied 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). This Court holds that the proper measure of damages to be applied in this case

is the difference between the amount received by Mrs. Reese for the stock, or $12,000.00 (discharge of the $10,000.00 stock lien plus $2,000.00), and the current value of 51% of the stock in Cambell Square, Inc. *See also Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967) *cert. denied* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

In this case, plaintiffs have submitted evidence of the fair market value of the Cambell Square property as of January, 1975. This evidence was in the form of opinion testimony of a real estate appraiser. His appraisal set the value of the property remaining in the hands of Cambell Square, Inc. as of January, 1975 at $207,000.00. This Court is sufficiently impressed with the appraiser's qualifications, familiarity with the property in question, surrounding property and the Rapid City area in general as well as his candor and demeanor on the stand to accept his opinion as establishing the value of the assets of Cambell Square, Inc. at $207,000.00. This opinion was not substantially controverted. However, as the Eighth Circuit Court of Appeals noted in *Myzel v. Fields,* 386 F.2d 718, 745–746 (8th Cir. 1967) *cert. denied* 390 U.S. 951, 88 S.Ct. 1043, 11 L.Ed.2d 1143 (1968), the value of the corporate assets is simply one factor to be considered in setting a value of the corporation's stock. Other factors which must be considered include: the liabilities of Cambell Square, Inc., its future prospects, the nature of its business, the nature of its competition and the skill of its current management. *Id.* Plaintiffs did not offer any evidence relating to those factors. In the judgment of this Court, however, they cannot be faulted for this omission. No amount of diligent discovery could have brought all of these factors to light since, as Jerry Brodsky testified, Cambell Square, Inc. has not prepared a balance sheet, or a federal income tax return, since 1968. The corporate records of Cambell Square, Inc. are subject to some question also, since a meeting dated by its minutes to have occurred in 1969 apparently did not actually take place until 1972. These difficulties will doubtlessly have some bearing on the ultimate current valuation of the Cambell Square, Inc. stock.

In the judgment of this Court, it would be unjust to award plaintiffs damages based simply on the value of the Cambell Square property accompanied by speculation as to the impact of the other factors. On the other hand, in light of the state of Cambell Square, Inc. as it relates to the good faith inability of plaintiffs to fairly establish the current value of the stock, it would be equally unjust to deny plaintiffs any recovery at all for failure to establish damages. Consequently, the parties to this case will be ordered to agree to employ an independent appraiser to fairly determine the current value of a 51% interest in Cambell Square, Inc. For purposes of this appraisal, the value of the Cambell Square property is to be considered $207,000.00. The appraiser agreed upon by the parties is to consider the factors outlined above in its appraisal of the stock of Cambell Square, Inc. Upon completion of this appraisal, and receipt of other relevant evidence to be submitted by the parties at a time to be set by the Court, judgment for the plaintiff will be entered based upon the difference between this Court's finding as to the current appraised value of 51% of the stock in Cambell Square, Inc. and $12,000.00.

The foregoing shall constitute this Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.