## CLARA B. GAETKE AND ANOTHER v. THE EBARR COMPANY, INC. AND ANOTHER.[1]

November 15, 1935.

No. 30,420.

[1]Reported in 263 N. W. 448.

394

R. F. Schroeder, for appellants.
John I. Davis and Tom E. Davis, for respondents.

JULIUS J. OLSON, JUSTICE.

Plaintiffs, husband and wife, were joint owners of two lots upon which was a six-room dwelling house used by them and occupied as such. The property was worth $6,000 but was subject to a mortgage of $1,800. Defendant company, a Delaware corporation, authorized to do business in Minnesota, owned a farm in Kandiyohi county comprising 114.42 acres, subject to a mortgage upon which there was an unpaid balance of $4,500, to which should be added an amortization payment due April 1 and another such falling due October 1, 1932, each amounting to $172.

Plaintiffs were wholly inexperienced in business matters and transactions of every kind and possessed of very limited education. The husband, a common laborer throughout his lifetime, had been without work over a period of more than a year. They were discouraged and disheartened with this situation. Their future looked dark. Want was staring them in their faces. Naturally enough their minds drifted to the country and especially to farming. So they were alert to any proposition likely to afford them the oppor-

tunity of trading their equity in their city home for a farm. Thereby, so they thought, would their future be made more secure. One Reardon had advertised farms for sale or exchange for city property. They read this advertisement and promptly called to see him. Defendant Barre, the president of defendant company, was informed by Reardon of this opportunity. So after plaintiffs had interviewed Reardon there was no delay in putting Barre on the trail for a deal. Defendant Barre promptly and efficiently proceeded to get them interested in this particular farm. He, as is common with salesmen in general and with real estate agents in particular, praised the farm highly and in glowing terms. He assured plaintiffs that the soil was excellent, very productive, and the land free from noxious weeds; that the buildings were in good shape and that they would have a fine chance to prosper if the deal were made. He also informed them that his company had a lot of personal property on the farm, consisting of farm machinery, livestock, horses, poultry, and other items, so that if the deal were put through they would get a farm equipped with the necessary personal property that is ordinarily required to make farming successful. He represented that the farm he proposed to exchange was worth at least $11,000. As a result, after several conferences, an exchange agreement was drafted under the direction of Mr. Barre. Plaintiffs did not read this instrument but assumed that it contained the arrangement orally made. Each party was to furnish the other with an abstract showing clear title to the property to be conveyed, subject only to the respective mortgages hereinbefore mentioned. On September 3, 1932, the deeds and other papers were in fact drawn but dated September 7. As a part of the deal plaintiffs executed a note and second mortgage as security upon the farm in the amount of $1,500 payable to the order of defendant company, the instruments being in blank when signed by them. Defendant Barre informed plaintiffs that there was a tenant in possession of the farm but that the lease was so drawn that upon sale possession would at once go to the purchaser. He exhibited to them a lease wherein the phrase "subject to sale" was used. This, he explained, meant that the tenant was obliged to

surrender possession at once in event of sale. On Sunday, September 4, plaintiff husband had loaded a truck containing their various household effects and proceeded to the farm for the purpose of taking possession and to place his household goods and other effects there. He soon learned that the tenant would not give up possession, his claim being that he had a lease which by its terms did not expire until January 1 next following. The tenant brought out his duplicate lease, and this contained no such phrase as the copy that had been delivered to plaintiffs. The tenancy was not to be so disturbed. It was absolute insofar as any sale purporting to put an end thereto was concerned. Plaintiffs forthwith informed defendant Barre of the difficulty that confronted them.` They were assured that everything would be remedied and a few days later went back to the farm and there sought to·adjust their differences in respect of possession. Nothing came of this later agreement however. The tenant remained in possession, although plaintiffs were permitted to place their household effects in the loft of the barn and permitted to occupy the garage, where they prepared their meals and there tried to get along as best they could. But plaintiffs soon discovered that the land was not what it had been represented to be. It was found to be very stony and the cultivated areas badly infested with quack grass, Russian thistles, and other noxious weeds. Some of the land was wet and soggy and could be used only for hay or pasture purposes. Defendants forwarded to plaintiffs at Atwater the deed running from the former owner to the company and also a deed from the company to plaintiffs. Plaintiffs observed, however, that the deed from the former owner (Johnson) contained but one attesting witness and as such, so they were informed, could not be placed on record. Plaintiffs, before going to the farm, had delivered to defendant Barre for his corporation a deed to their St. Paul home, including as well an abstract, both of which defendants found satisfactory. Defendants took possession of the St. Paul home and have retained possession of the same ever since. Plaintiffs never came into possession of the farm nor the personal property, the tenant insisting upon his right of possession of the whole thereof, his lease covering the farm

as well as the personal property. Because of these difficulties, plaintiffs on October 22, 1932, tendered back to defendants the Johnson deed as well as the deed from the company to them, plaintiff wife very forcefully and insistently demanding that their property be given back to them. Defendants refused, and this action, which is one in rescission, followed.

The cause was heard before the trial judge without a jury and findings made substantially as hereinbefore related, and as conclusions of law ordered that the deed executed by plaintiffs to defendant company be canceled and set aside, also that the $1,500 note and mortgage given by plaintiffs to defendant company upon the exchange should likewise be canceled and set aside.

Defendants moved for amended findings or, if such were denied, for new trial. The court denied the motion *in toto,* and this appeal followed.

Numerous errors are assigned by defendants as bases for reversal. After all, however, the important question for determination is whether the evidence for plaintiffs and the inferences that may appropriately be drawn therefrom sustain the result reached by the trial court.

Plaintiffs charge defendants with fraudulent misrepresentations in respect of the quality, condition, and value of the Kandiyohi county farm and the buildings thereon. They are not seeking damages, but demand rescission of the deal into which they claim they were led by defendants' falsehoods.

Going into the record we find ample proof that defendant Barre told these parties that the farm "had good buildings on it and was good soil and had a good title to it. * * * He said the land was all tillable and the buildings were good and that it had been worked every year"; also that "the stock and everything was in A-No. 1 condition"; that "there was no rocks or quack grass on the place." He assured plaintiffs that the farm was worth $11,000 and that the tenant's lease was in accordance with the duplicate thereof handed plaintiffs which contained the "subject to sale" clause, and explained that this meant that "when the farm was sold, the man on it would have to vacate." The record amply sus-

tains the trial court in finding that the actual value of the land did not exceed $15 per acre; that the land was infested with quack grass and Russian thistles. The house "was very poor, the rain would come through the kitchen roof * * * every time it would rain, we would have to put dishes around to catch the water. * * * The pantry was no good, all full of rat holes and paper covered all the rat holes. The upstairs was not finished at all." This testimony came from defendants' own tenant, and he as well as other witnesses testified to the condition of the farm in respect of stones, quack grass, and other weeds. There is also testimony to the effect that the low lands were boggy and water-soaked so that these parts were of very little, if any, value. Both plaintiffs testified that Barre told them "he would rather not have us talk too much about the place when we go up there," reference being had to the tenant in possession. It seems to us that this might readily be construed as an effort to keep plaintiffs from making inquiry from one likely to know the true facts regarding this farm. To what has already been related should be added the further fact, and this is highly important, that the typewritten duplicate of the lease handed to plaintiffs contained the phrase, "this lease is subject to sale," whereas the lease in possession of the tenant contained no such phrase. The original exhibit is here, and we have examined it. From this it is obvious that the phrase was typed into the exhibit after the exhibit itself had been prepared. The exhibit is a carbon copy. The phrase inserted clearly shows that it was typed into the instrument without the use of carbon. Nor are we permitted to overlook the fact that when defendant Barre was being cross-examined in respect of his interpretation of the meaning of the phrase heretofore mentioned, in response to the following question: "Didn't you tell her that that meant Hanover [the tenant] would have to move within a reasonable time after the land was sold," he answered, "I can't answer that without prejudice to myself." Also, on cross-examination it was brought out that he had put a mortgage on the property acquired from plaintiffs shortly after its procurement; and further:

Q. "Did you give a deed to it?
A. "Yes.
Q. "To whom?
A. "My daughter.
Q. "What is her name?
A. "Lorraine Barre.
Q. "Do you remember the date of it?
A. "I don't remember."

That plaintiffs have received absolutely nothing is beyond controversy. The only privilege they ever had was to store for a short time some of their furniture and household goods in the barn loft and to occupy the garage so that they might cook and sleep therein. These concessions were granted by the tenant pursuant to an arrangement made while plaintiffs still entertained the hope that litigation might be avoided. They had as yet not sought counsel. Mrs. Gaetke testified that the garage was so cold that her preserves froze. While Mrs. Gaetke was there suffering many hardships in her attempt to go through with the bargain, her husband sought and secured labor from neighboring farmers so as to eke out a bare existence. When the cold weather came on, the tenant in possession being unwilling to surrender possession, plaintiffs were in such position as to make it impossible for them to go along with defendants any longer. Plaintiffs claim that defendants' failure to give them possession is in and of itself ample ground to sustain the relief granted by the court.

1. It is not necessary to sustain the order below that we further discuss the evidence or the issues presented. It seems clear that plaintiffs were the victims of designed fraud. It would be a sad reflection upon the law if these plaintiffs were not permitted to get back their former home, possession of which already has been much too long withheld.

From what has been heretofore said we think it clear that actionable fraud was established.

"A person is liable for fraud if he makes a false representation of a past or existing material fact susceptible of knowledge, know-

ing it to be false, or as of his own knowledge without knowing whether it is true or false, with intention to induce the person to whom it is made to act in reliance upon it, or under such circumstances that such person is justified in acting in reliance upon it, and such person is thereby deceived and induced to act in reliance upon it, to his pecuniary damage." 3 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 3818.

Of course, defendants cannot escape liability even if the average man under the circumstances would not have believed or acted upon representations made.

"One who has deceived another cannot be heard to say that the victim ought not to have trusted him. In an action for relief on the ground of fraud, the question is not whether the representations would deceive the average man. It is a question whether they were of such a character and were made under such circumstances that they were reasonably calculated to deceive the plaintiff, and the diligence and prudence that is required of the plaintiff is not necessarily such as an ordinarily prudent person would exercise, but such as may reasonably be expected of a person of the intelligence and character of the person seeking relief." *Id.* § 3822, and cases cited.

The parties were not upon an equal footing in point of intelligence and business experience. The contract they made was obviously an improvident and unfair one.

2. But we need not further discuss the fraud question. Failure on the part of defendants to give plaintiffs possession is in and of itself ample justification for sustaining the order made below. In Norman v. Wengert, 152 Minn. 52, 187 N. W. 708, the second syllabus paragraph reads:

"The occupancy of the premises by a tenant of the vendors is an encroachment upon vendee's right of possession which he is under no obligation to assume or accept. The vendee was within his legal rights in treating vendor's failure to give possession as a basis for the rescission of the contract."

In Kirby v. Dean, 159 Minn. 451, 199 N. W. 174, 175, this court held:

"One who seeks to rescind or one who has rescinded a contract, because of the fraud of the other party thereto, is not required to prove that he was damaged in order to sustain his right to a rescission. It is enough that he did not get in substance what he was promised." And [159 Minn. 454]: "He may rescind even though the proffered substitute for the thing or performance promised by the misrepresentations is of greater value than the thing or performance so promised. It is not a question of adequate value, but one of substantial compliance, and, although there be adequate value, there is a clear right of rescission where there is a material lack of compliance otherwise with the standards fixed by the misrepresentations complained of."

In the instant case it is beyond dispute that plaintiffs never got possession of any of the property that they were to have under their contract of exchange. Upon discovery of the fraud practiced upon them they tendered the deeds they had received, i. e., the deed from Johnson, the former owner, to the defendant company and the deed from the defendant company to plaintiffs. Both instruments were introduced in evidence and are amongst the files. Neither has been recorded. Obviously, then, they did everything they could do to give defendants that which they had received. The personal property never reached their hands; hence there was nothing for them in that respect to return.

3. It is urged that the trial court was in error in not allowing defendants compensation for certain improvements claimed by them to have been made upon plaintiffs' property. The evidence is extremely unsatisfactory in respect of the value of the improvements made. But that aside, we think defendants cannot under the circumstances here related assert compensation for such. This is so for the simple reason that their fraud was the cause of getting plaintiffs' possessions and paper title to this property. The rule is well stated in 6 R. C. L. p. 940, §§ 321, 322. The following quotation from § 322 appearing on p. 942 is appropriate to what we are here discussing:

"Moreover, if a wrongdoer who has obtained property by fraud has made expenditures upon it enhancing its value, he has no claim for these expenditures against one who by reason of the fraud practiced upon him, is entitled to demand its restitution, and who himself restores all which he has received, or tenders the restoration of it, when he rescinds the contract. In such case the wrongdoer is in a situation analogous to that of a trespasser who wrongfully converts a chattel and increases its value by labor bestowed upon it."

See also Holmes v. Wilkes, 130 Minn. 170, 153 N. W. 308.

Other assignments of error have been examined and found to be wanting in merit.

Affirmed.

