D. E. NORRIS AND ANOTHER, *d. b. a.* ASSOCIATED BUYERS & JOBBERS, v. HYMAN D. COHEN.[1]

April 25, 1947.

No. 34,321.

[1]Reported in 27 N. W. (2d) 277.

472

*Louis Sachs* and *James S. Niman*, for appellant.

*Maurice W. Stoffer* and *John A. Burns*, for respondents.

THOMAS GALLAGHER, JUSTICE.

Action for money had and received through defendant's conversion of certain merchandise belonging to plaintiffs. Defendant denied the conversion and further pleaded that a written instrument, executed by plaintiffs and defendant on June 24, 1944, constituted a release of plaintiffs' claims herein. In reply, plaintiffs denied that said release contemplated or included the settlement or adjustment of the claims set forth in the complaint. The trial court found for plaintiffs in the sum of $2,986.09. This appeal is from an order denying defendant's motion for a new trial.

The questions presented are (1) whether the evidence is sufficient to sustain the trial court's finding that on November 12, 1943, defendant sold plaintiffs' merchandise consisting of stadium boots of the value of $568.20 and retained the proceeds of such sale; that on January 31, 1944, defendant sold plaintiffs' merchandise consisting of stadium boots of the value of $614.25 and retained the pro-

ceeds of such sale; and that between June 19 and July 7, 1944, defendant converted similar merchandise belonging to plaintiffs of the value of $1,803.64; and (2) whether the instrument of June 24, 1944, executed by plaintiffs and defendant effectively released plaintiffs' claims herein.

For some years past, plaintiffs have been associated together as a partnership, operating under the name of Associated Buyers & Jobbers (hereinafter referred to as *Associated),* in the city of Minneapolis. *Associated* is engaged in general merchandising as jobbers selling to retailers throughout the Northwest.

On or about July 1, 1942, *Associated* engaged the services of defendant under a written contract. Thereunder, defendant agreed to install a shoe department for plaintiffs and to devote his time to the sale of merchandise therein. Plaintiff D. E. Norris testified that defendant was instructed to limit the stock of merchandise in this department to $50,000 in value and was to purchase nothing without Norris's signature on the orders; that contrary to these instructions defendant, without consulting Norris or procuring his authorization, immediately commenced purchasing large quantities of footwear; that the merchandise "kept rolling in * * * until it got to the place where we didn't have room in the basement for it"; that subsequently he found that footwear in excess of $200,000 in value had been purchased for *Associated* by defendant.

On or about November 12, 1943, Louis D. Hoffman, doing business as the *Shoe Mart,* a customer of *Associated,* called defendant at the office of *Associated* to place with the latter an order for stadium boots. Defendant advised him that the *Shoe Mart's* allotment had been exceeded and that the only way the boots could be purchased from *Associated* was through the account of *Vogue Bootery,* another retail concern. This was agreed to, and on December 7, 1943, the boots were delivered. At that time, on instructions from defendant, Hoffman delivered to defendant his check therefor in the sum of $568.20, made payable to *Vogue Bootery.* This check was endorsed on behalf of the *Vogue Bootery* by defendant, cashed, and the proceeds thereof retained by defendant. On January 31, 1944, a similar transaction

took place with Hoffman. This time the check for the goods delivered amounted to $614.25 and was made payable directly to defendant upon his instructions. It was likewise cashed and the proceeds thereof retained by defendant.

Hoffman testified that the merchandise for which the checks were delivered came from *Associated* and that it was of the same type, quality, and lot number as merchandise previously purchased by him from *Associated*. His store manager, Mrs. Elsie Peterson, testified that, while defendant personally delivered the merchandise, she recognized it as merchandise from *Associated;* that it was the same type, lot number (1066), make, and quality and that it had the same lining material as merchandise previously purchased from *Associated;* that the *Shoe Mart* had never purchased such merchandise or any similar to it from defendant or from anyone else except *Associated;* that at the time defendant did not tell her that the merchandise belonged to him or to anyone else than *Associated*.

Plaintiffs did not learn of these transactions until some time subsequent to the execution of the release dated June 24, 1944. They were first advised of them by Hoffman after he had disagreed with defendant. They inquired of defendant with reference thereto and were advised by him that the merchandise delivered to Hoffman was from defendant's own personal stock which he had purchased from the *Athletic Shoe Company* of Chicago and which had been stored at his home at 5307 First avenue south in Minneapolis. The *Athletic Shoe Company* was the only company manufacturing this particular type, quality, and brand of merchandise, and this company shortly thereafter advised plaintiffs that it never had engaged in any business transactions with defendant. The evidence further disclosed that defendant had not acquired the property at 5307 First avenue south until March 7, 1944, long after the two transactions took place.

The facts with reference to the item of $1,803.64 are as follows: The shoe department of *Associated* having proved unprofitable, plaintiffs, in May of 1944, determined to close it out and sell the balance of stock therein. Defendant advised Hoffman at about that time that the stock of *Associated* could be purchased at a substan-

tially reduced figure. Hoffman and defendant then formed a partnership whereunder they were to engage in the shoe jobbing business under the name of *Mid-Continent Footwear Company*. Each contributed a substantial cash sum to the enterprise. Hoffman, without advising *Associated* that defendant was his partner, then purchased a stock of merchandise from *Associated* for the new company of the value of $25,648.14.

Delivery of this merchandise to *Mid-Continent* took place between June 19 and July 7, 1944. It was packed in cartons, each carton marked with the quantity and type of merchandise therein. Upon opening and checking the cartons, Hoffman discovered that many of the cartons contained merchandise in excess of the amounts indicated thereon or covered by the invoices therefor. He inquired of defendant with reference to this and was advised by him that the value of the excess merchandise was to be credited to defendant's account in the new enterprise; that he had worked out this arrangement with *Associated* to take care of commissions due him from *Associated* on past transactions. He gave to Hoffman and the auditor of *Mid-Continent*, Mr. Newman, a written itemization of the excess merchandise, and the price at which it was to be credited to him on the books of the new partnership. This amounted to $1,803.64, and this sum was entered on the books of *Mid-Continent* as a merchandise credit in his favor.

Plaintiffs testified that they had no knowledge of this transaction and denied that they had authorized defendant to withdraw any merchandise from their stock. They denied that there was any commission due and owing from them to defendant over that described in the release of June 24, and which had been paid to defendant in cash at that time, and testified that they were unaware of defendant's withdrawal of the merchandise until advised thereof by Hoffman long subsequent to the execution of the release.

Defendant denied that any excess merchandise had been removed from *Associated* by him, and he testified that the $1,803.64 credited to his account by *Mid-Continent* represented commissions due him from *Mid-Continent* for orders previously procured by him for *As-*

*sociated* but which were to be filled by *Mid-Continent;* and that he had so instructed both Hoffman and Newman. This was denied by both the latter, and Hoffman testified that defendant's compensation from *Mid-Continent* was limited to 50 percent of the profits of the new organization, and nothing more. The release of June 24, 1944, acknowledged receipt by defendant of $2,000 in payment of all commissions then due. No sales were made or orders obtained for *Associated* thereafter, and the withdrawal by defendant and delivery of at least a portion of the excess merchandise took place subsequently.

The trial court found that the conversions above described were made "under circumstances amounting to theft"; that the facts relative thereto were not known to plaintiffs and were not within the contemplation of the parties at the time the release of June 24 was executed, and ordered judgment for plaintiffs for the total value of the merchandise appropriated by defendant in the three transactions.

■ We are of the opinion that there is ample evidence to sustain the findings. On the first two transactions it is clear from the testimony of both Mr. Hoffman and Mrs. Peterson that the merchandise was ordered and came from *Associated.* It is unlikely that defendant would have sold and delivered his own merchandise without so advising Hoffman at that time. The goods were identical in form, lot number, quality, type, and make with that carried by *Associated* and previously sold and delivered by it to Hoffman. It was manufactured only by the *Athletic Shoe Company* under this lot number, and that company had never dealt with defendant. Defendant's testimony that it had been delivered from his stock of merchandise stored at 5307 First avenue south, long prior to the time he lived in or acquired this property, justified the trial court in disregarding all of his testimony on this issue. Much additional evidence of a corroborative nature was submitted. We are of the opinion that all such evidence amply sustained the trial court's finding that the merchandise sold on these two occasions belonged to *Associated,* was taken from its stock without its knowledge, and sold by defendant, who retained the proceeds of such sales.

▪ ■   There is likewise ample evidence to support the trial court's finding with reference to the item of $1,803.64. Hoffman's testimony and that of other witnesses clearly established that the merchandise covered thereby came from *Associated*. It was packed in the latter's cartons and delivered by its employes. A number of the cartons contained more merchandise than the quantity marked on the outside thereof or covered by the invoices. No payment was ever made to *Associated* for this surplus. Defendant alone was aware of the amount and value thereof and specifically instructed Hoffman and Newman to credit his account therewith. A memorandum in his handwriting delivered by him to Newman described the excess merchandise accurately and fixed the value thereof at $1,803.64. This amount was set up on the books of the new company to his credit for *merchandise,* and not commissions, long before this litigation was anticipated. Both Hoffman and Newman denied that any reference was made by defendant at that time to commissions to become due him from the new concern. Plaintiffs denied that there were any commissions due him from *Associated,* and the release he signed June 24, 1944, indicates that he was paid in cash for all past-due commissions up to that date. No further sales were made thereafter. Such evidence amply sustains the trial court's findings on this item.

■   It is obvious that the release executed by the parties on June 24, 1944, was executed by plaintiffs while ignorant of the fact that defendant, an employe in whom they had imposed trust, had actually withdrawn merchandise from their stock, sold the same, and retained the proceeds or otherwise received credit therefor in his new venture without accounting to plaintiffs. While it is true that the release purported to discharge defendant from all claims, damages, and actions of whatever kind or nature up to the date thereof, the law is well settled that such a general release does not extend to claims of which one party thereto was wrongfully kept in ignorance by the other. This court is committed to the doctrine that the wrongful concealment of facts by one party to a release affords sufficient ground to the other for setting it aside, particularly where the information concealed is not equally within the knowledge of both

parties. In King v. International Lbr. Co. 156 Minn. 494, 496, 195 N. W. 450, 451, this rule was expressed as follows:

"* * * There was no evidence that he [defendant's agent] made any affirmative false statement to induce her to sign the release, but, if her testimony is true, the surrender and cancelation of the lease was never mentioned. If she did not read the release and he knew it, he also knew that she did not understand its effect.

"The case is one for the application of the rule that if a party conceals a fact material to the transaction and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated. Thomas v. Murphy, 87 Minn. 358, 91 N. W. 1097. The rule has also been stated as follows: 'Failure to correct another's delusion is obviously fraudulent if the circumstances are such that the fraud feasor's very silence reasonably caused the misapprehension, or if he has in any way contributed to the delusion.' 26 C. J. p. 1073. It was said in C. H. Young Co. v. Springer, 113 Minn. 382, 129 N. W. 773, that a contract may be avoided by one of the parties for his own mistake of fact when such mistake was caused by the inequitable conduct of, or when known to and wrongfully acted upon or taken advantage of by, the other contracting party."

This doctrine that a unilateral, as distinguished from a mutual, mistake may be sufficient to avoid the effect of a release was reaffirmed in Nadeau v. Maryland Cas. Co. 170 Minn. 326, 329, 212 N. W. 595, 596, where we stated:

"In order for plaintiff to prevail it is necessary that the release be set aside. That process is equitable and in matters of contract equity prevents one from taking knowing and unconscionable advantage of another's mistake for the purpose of enriching himself at the other's expense. It is but 'obvious justice that mistake by one party and knowledge of the mistake by the other, will justify relief as fully as mutual mistake.' 3 Williston, Contr. § 1497. * * * even with unilateral mistake of law relief may be had by the innocent

party if his mistake is accompanied by inequitable conduct on the part of his adversary, as where the latter knowingly has sought advantage from it for his own unconscionable enrichment."

See, also, Benson v. Markoe, 37 Minn. 30, 33 N. W. 38, 5 A. S. R. 816; Mix v. Downing, 176 Minn. 156, 160, 222 N. W. 913, 915; Becker v. Bundy, 177 Minn. 415, 225 N. W. 290; Rigby v. Nord, 208 Minn. 88, 292 N. W. 751.

Finally, it is also well established that where such a situation exists the facts may be shown in a legal action to defeat the effect of the release when it is interposed as a defense. Such procedure was followed in the cases above cited, as well as numerous others cited under 5 Dunnell, Dig. & Supp. § 8374.

■ Defendant asserts that the present action is one in conversion and that the evidence is insufficient to establish conversion. The complaint indicates that plaintiffs' action is one for money had and received. The rule is established in Minnesota that an action for money had and received will lie whenever one person has possession of money which in equity belongs to another and ought to be delivered to him. It is in the nature of an equitable remedy to compel one unjustly enriched at the expense of another to disgorge, and it is not restricted by technical rules. See, 4 Dunnell, Dig. & Supp. § 6128, and cases cited. Here, the action does not fail, since the payment to defendant did not destroy plaintiffs' right of action against another debtor who had paid the money to defendant. See, Heywood v. Northern Assur. Co. 133 Minn. 360, 158 N. W. 632, Ann. Cas. 1918D, 241. It will lie to recover money received through a conversion. Brady v. Brennan, 25 Minn. 210; Libby v. Johnson, 37 Minn. 220, 33 N. W. 783.

Examination of the record convinces us that plaintiffs' action is correct in form as one for money had and received and that the evidence submitted is sufficient to sustain the findings and conclusions of the trial court therein.

Affirmed.