ESTATE OF Emlyn JONES, Deceased,
by Lorraine J. BLUME, its personal
representative, Respondent,

v.

J. Peder KVAMME, et al., Appellants.

No. C9–87–2367.

Court of Appeals of Minnesota.

Oct. 4, 1988.

Review Granted Dec. 1, 1988.

Daniel P. Taber, Minneapolis, Kevin O'Connor Green, Mankato, for respondent.

Jeffrey F. Shaw, Briggs and Morgan, St. Paul, for J. Peder Kvamme.

C. Allen Dosland, New Ulm, for John Kvamme.

Heard, considered and decided by FOLEY, P.J., and HUSPENI and RANDALL, JJ.

## OPINION

HUSPENI, Judge.

Lorraine Blume brought this rescission action in February 1982 alleging that Peder Kvamme defrauded her late husband, Emlyn Jones, by personally purchasing his 11 shares of Kato Engineering stock for $5,500 while representing that the stock could only be sold back to the corporation as treasury stock. Blume also sought a constructive trust on the proceeds of the stock, which Kvamme had transferred to his children.

The trial court bifurcated the two actions, leaving the constructive trust issue for a subsequent trial. A jury trial was held on the fraud claim, and by special verdict the jury found Kvamme guilty of fraud, valued the stock at $125,000 in 1967 and awarded punitive damages of $46,000. In post-trial proceedings, the trial court found that Kvamme had transferred his stock to his children in 1978 after the company's sale. The trial court held that Blume was entitled to $678,367.68 in rescissionary damages, offset by $5,500, along with $46,000 in punitive damages. Kvamme appeals. We affirm.

## FACTS

Kato Engineering Company (Kato) was a small closely held corporation located in Mankato and established by Cecil Jones in 1928 for manufacturing generators. The company grew in size during the war years; Kato had 180 shares of common stock. In the mid–1960's Kato's board of directors consisted of Cecil Jones (157 shares), William Cliff (11 shares), Emlyn Jones (10 shares) and Peder Kvamme (no shares). Two shares were treasury stock.

Emlyn Jones was Cecil's brother. Emlyn worked on the generators as a troubleshooter; he was not active in the business affairs of Kato. Peder Kvamme was Kato's chief financial officer or comptroller.

Cecil Jones controlled the ownership and transfer of Kato stock. Ernest Mueller, an employee of Kato since 1935, testified that it was common knowledge that upon retirement an employee had to sell his stock, common or preferred, back to the company. Fae Bateman, a 40 year employee, testified to the same belief.

Kato's articles of incorporation required board action for the transfer of common stock. Each stock certificate was inscribed "Transferable only on the books of the corporation." Kvamme admitted that Cecil, as Kato's dominant shareholder, controlled the board. He *was* the board of directors and determined who was going to own the stock.

From 1964 to 1970 Emlyn Jones suffered from declining physical and mental health. His personal physician, Dr. Dobson, testified that in 1965 he admitted Jones to the hospital due to general arteriosclerosis and diabetes mellitus, complicated by mild dementia.

The testimony of Emlyn Jones' family, friends, and co-workers described numerous incidents showing the deterioration of his faculties. A dramatic personality change rendered a mild, good-humored man into a mean and irritable one who could no longer perform simple mechanical tasks. His memory slipped, he repeatedly lost his spending money, and could no longer drive after repeatedly damaging the family car.

In 1966 Emlyn Jones' retirement was imminent, due to his age (66) and failing health. Kvamme testified that Cecil Jones was anxious to get Emlyn's Kato stock back in order to keep it in the company. Emlyn's widow, Lorraine Blume, testified that she did not want to sell the stock, for Emlyn had told her many times never to sell it because it would be valuable if the company ever sold.

Believing her husband to be incompetent in financial matters, Lorraine put the stock in her safe deposit box. Cecil Jones' wife, Mildred Jones, testified that Kvamme asked Cecil if he could approach Emlyn and

Lorraine to try to persuade them to sell the stock. Mildred testified that Cecil thought Kvamme was acting on behalf of the company.

Lorraine Blume testified that in 1966 Kvamme, claiming to be representing Kato, came to the Emlyn Jones' home and tried to convince them to sell the stock back to Kato. He presented a Kato Engineering written statement offering $5,500 for Emlyn's stock. Believing that the company set the price and that the stock was not transferable, they agreed to consider it.

Charlotte Mueller, Emlyn's first wife's niece, remembered that Emlyn told her of Kvamme's meeting at their house and his stock offer. Charlotte's husband Ernest testified that Emlyn wanted the stock to go back to the company.

As comptroller, Kvamme knew the value of the company and that Cecil met with interested buyers in the mid–1960's, including the eventual purchaser, Reliance Electric.

Kvamme claimed Emlyn and Lorraine knew that the stock purchase offer came from him, personally. He claimed that most of the time in that meeting was spent discussing Emlyn's continued wage and Kato's profit-sharing plan. Kvamme claims that he reported back to Cecil, who decided Kato would pay Emlyn a wage for a period of time. He claimed Cecil told him he could buy the stock for himself.

Kvamme called Lorraine again and they met in her home. He told her about the profit-sharing program and Cecil's offer of continued wages. Lorraine testified that Emlyn put increasing pressure on her to return the stock to the company. He even woke her in the middle of the night and threatened suicide if she did not return the stock. Tom Sullivan, attorney for Kato, also called her with requests to sell the stock back to Kato. She finally acquiesced and gave the key to her safe deposit box to Emlyn. Emlyn sold the stock immediately and received a "counter check" drawn on Kvamme's personal account for $5,500 and signed by Kato's comptroller, Kvamme. A counter check has no drawer's name on it and was commonly used in southern Minnesota at that time. Lorraine knew this was not a corporate check, but a personal one. Kato corporate checks normally required two signatures; however, Cecil Jones was out of town when the stock was sold.

Emlyn endorsed the certificate on the back with no transferee named, as was the custom with treasury stock. Kvamme claims he endorsed the certificate to each of his four children, but maintained possession of it in his safe deposit box.

Testimony of Cecil's attorney, E.D. Mc-Lean, showed that Cecil was upset about the transfer and wanted to know if he could get the shares back from Kvamme. McLean's advice was that he did not know how to change the stock ownership. Cecil's wife testified that Cecil believed Kvamme was acting for the company.

Two years after Emlyn sold the stock, he was confined to a nursing home and one year later he died. According to his widow and relatives, Emlyn always believed he had sold the stock to Kato.

The private annual reports to Kato's board of directors continued to show Emlyn as owner of the stock in 1968 and 1969, as was the custom with treasury stock. Kvamme prepared these reports, which were distributed only to Cecil Jones, Emlyn Jones, William Cliff and himself. Only after Emlyn died was Kvamme listed as owner of the stock.

After Cecil had a stroke in 1974, Kvamme became Kato's chief executive officer, then later its president after Cecil died in 1976. One year later, the company was sold to Reliance Electric for about $12 million. Each share of Kato common stock was worth $65,000. Upon distribution, the total amount paid for the 10 shares formerly held by Emlyn was $678,367.68 plus interest.

In June 1980 Lorraine was approached by an attorney who was doing discovery for litigation of the Cecil Jones estate. That was the first time she learned that Kvamme, not Kato, had bought Emlyn's stock. Lorraine commenced this action. At trial, each side presented an expert who offered testimony on the value of the stock

in 1967. A jury found Kvamme guilty of fraud and, by special verdict, valued the stock at $125,000 in 1967. In post-trial proceedings the trial court found that Kvamme had transferred the stock to his children in 1978 after the company's sale. The trial court held that Blume was entitled to $678,367.68 in rescissionary damages, offset by $5,500, along with $46,000 in punitive damages.

### ISSUES

1. Does the evidence support the jury's finding of misrepresentation?

2. Had the statute of limitations expired when respondent discovered the fraud?

3. Were the trial court's rulings prejudicial?

4. Did the trial court err in adopting a rescissionary measure of damages?

5. Did the trial court err in refusing to grant a new trial based on newly discovered evidence?

### ANALYSIS

### I.

Kvamme argues that the trial court erred in denying his motions for a directed verdict or judgment notwithstanding the verdict (JNOV), claiming there was no evidence of misrepresentation or non-disclosure of facts to Emlyn Jones.

Review of a jury's special verdict findings is very limited.

> It is well settled that we will set aside an answer to a special verdict question only when it is perverse and palpably contrary to the evidence. * * * If the answers to special verdict questions can be reconciled on *any* theory, the verdict will not be disturbed.

*Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984).

In reviewing a motion for a judgment notwithstanding the verdict, the applicable standard

> is whether there is any competent evidence reasonably tending to sustain the verdict. * * * Unless * * * the evidence is practically conclusive against the verdict, or that reasonable minds could reach but one conclusion against the verdict, the trial court's order denying the motion for judgment notwithstanding the verdict should stand.

*Seidl v. Trollhaugen*, 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975).

Conflicting testimony presented a fact question to be resolved by the jury. Upon review, the prevailing party is entitled to every reasonable inference that may be drawn from the evidence. *Edgewater Motels, Inc. v. Gratzke*, 277 N.W.2d 11, 14 (Minn.1979). "A jury may base its findings on circumstantial evidence notwithstanding direct evidence to the contrary." *Frank v. Stiegler*, 250 Minn. 447, 451, 84 N.W.2d 912, 916 (1957).

There were numerous discrepancies in Peder Kvamme's version of the facts. Kvamme first stated that he didn't know if Emlyn knew that he was buying the stock, then later testified that he told Emlyn that he (Kvamme) was the purchaser. Blume and Cecil's wife claimed that Kvamme always purported to be representing Kato. This essential fact is supported by the annual report to the board of directors, which never disclosed that Kvamme actually owned the stock until after Emlyn's death. As a result, Emlyn had no way of knowing that Kvamme had really purchased the stock.

Kvamme testified that he bought the stock as a favor to Cecil, at Cecil's request, though he didn't really want the stock himself. However, Cecil's attorney and his wife both testified that Cecil was very upset that Kvamme had purchased the stock. Cecil's attorney testified that Cecil wanted to get the stock back, and his wife said that Cecil believed Kvamme was supposed to be representing the company.

Kvamme denied that Emlyn was having health problems at the time his stock was sold. He testified that his health was "normal for a man his age" and "he didn't have any problems at all." However, Emlyn's failing health was well documented by his doctor and evident to friends and family. Kvamme himself wrote the minutes for the

monthly board meeting which stated that Emlyn was retiring due to failing health. There is a long list of such inconsistent statements indicating that the jury correctly found Kvamme's testimony to be unreliable.

The record provided ample evidence to support the jury's finding that Emlyn believed his stock could only be sold back to Kato. The testimony of Ernest Mueller and Fae Bateman, two long-time Kato employees, showed this was accepted as common knowledge. By concealing his intention to purchase the stock for himself, Kvamme concealed the fact that the stock did not have to be sold back to the company.

> [I]f a party conceals a fact material to the transaction and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated * * *. 'Failure to correct another's delusion is obviously fraudulent if the circumstances are such that the fraud-feasor's very silence reasonably caused the misapprehension, or if he has in any way contributed to the delusion.'

*Norris v. Cohen*, 223 Minn. 471, 478, 27 N.W.2d 277, 281 (1947) (citations omitted).

■ A person is justified in relying upon a false representation, although he might have ascertained its falsity had he made an investigation. *City of Coon Rapids v. Suburban Engineering, Inc.*, 283 Minn. 151, 156–57, 167 N.W.2d 493, 496 (1969). Therefore, Emlyn had a right to rely on the representation that Kato was buying his stock, and had no duty to investigate whether Kvamme was secretly planning to keep it for himself.

■ Kvamme argues that Emlyn had notice that he was personally buying the stock because he paid for it with a counter check drawn on his own bank and not a corporate check. However, this is not conclusive evidence because the check had no name on it. Even if Emlyn knew that the check was drawn on Kvamme's personal account, he could reasonably assume that as comptroller, Kvamme was writing the check in Cecil Jones' absence. Emlyn could have assumed that because Kvamme was temporarily unable to get the two necessary signatures, he would be reimbursed by the company when Cecil returned.

> We have repeatedly held that one who deceives another to his prejudice ought not to be heard to say in defense that the other party was negligent in taking him at his word.

*Spiess v. Brandt*, 230 Minn. 246, 254, 41 N.W.2d 561, 567 (1950).

Whether the check should have put Emlyn on notice that the stock was not going to Kato was a question of fact for the jury to decide.

## II.

■ Kvamme claims that Blume had constructive notice in 1967 that he bought the stock. Minn.Stat. § 541.05, subd. 1(6) (1986) provides that a fraud action must be commenced within six years, but "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

Lorraine Blume testified that she did not discover the stock had actually been purchased by Kvamme personally until 1980, when litigation of Cecil Jones' estate began. "The determination of when discovery should reasonably have been made is one of fact." *Murphy v. Country House, Inc.*, 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976). There was ample direct and circumstantial evidence establishing that Emlyn Jones had no reason to mistrust Kvamme.

Kvamme argues that Blume had constructive notice because she could have discovered in 1967 that Kvamme was the purchaser. For this argument Kvamme relies primarily on two cases. In *Bustad v. Bustad*, 263 Minn. 238, 242, 116 N.W.2d 552, 555 (1962), the court said:

> [T]he facts constituting the fraud are deemed to have been discovered when, with reasonable diligence, they could and

ought to have been discovered. The mere fact that the aggrieved party did not actually discover the fraud will not extend the statutory limitation, if it appears that the failure sooner to discover it was the result of negligence, and inconsistent with reasonable diligence.

In *Bustad*, a fraud action, summary judgment was granted. On review the court found the defendant made a clear renunciation of an obligation to pay the plaintiff before the six-year statute of limitations had run and it was incumbent upon the plaintiff to commence an action within six years from the date of the last payment due. *Id.* at 240, 116 N.W.2d at 554. The court said:

[T]here was ample time in which to proceed, and plaintiff's failure to take appropriate action with full knowledge of defendant's attitude in the matter forecloses recovery.

*Id.*

In this case the facts are quite different. There was no clear evidence showing that Emlyn or Lorraine had even a suspicion of misrepresentation until 1980.

*Kassan v. Kassan*, 400 N.W.2d 346, 349 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. April 23, 1987), involved an action for fraud, misrepresentation, and inadequate disclosure in connection with the settlement of an estate, thirty years after the alleged offense. Appellant admitted that he "questioned the honesty and legality of respondent's actions, and was aware of alleged improprieties as far back as 1951." *Id.* The court held that these admitted suspicions triggered the running of the statutory time limit. *Id.* at 350. No such triggering event or admission exists in this case.

Absent any suspicion of misrepresentation or any triggering event which could have aroused suspicion, the jury was correct in finding that Lorraine did not know and could not reasonably have known before 1980 that Kvamme was the true stock purchaser. Therefore, this action was not barred by the statute of limitations.

### III.

Kvamme claims that four separate rulings constituted prejudicial error.

■ 1) He claims the trial court in bifurcating Blume's fraud action against Kvamme from her constructive trust action denied due process and full participation to the other named defendants—Kvamme's four children, who were the recipients of the 10 shares of stock sold by Emlyn Jones to Kvamme. In a pre-trial order the court bifurcated the trial and said:

The defendant children may fully participate in the initial phase of the trial against their father, but multiple counsel will not be permitted to present the same evidence or to successively examine witnesses concerning the same subject matter.

The trial court saw no need to duplicate presentations to the jury. Under Minn.R. Civ.P. 42.02, the court may order separate trials of any claim "in furtherance of convenience * * * or when separate trials will be conducive to expedition and economy." We find no error in the trial court's actions. We note initially that no review of the bifurcation has been sought by the Kvamme children. Further, counsel for the Kvamme children actively participated in all phases of the trial by cross-examination, objection and argument to the court.

■ 2) Kvamme claims that evidence of Emlyn Jones' state of mind and health were inadmissible as hearsay under Minn. R.Evid. 801(c). However, Emlyn Jones' physical and mental health were important circumstances related to his reasonable reliance on Kvamme's assertions. In cases of fraud the Minnesota Supreme Court has ruled:

[T]he evidence is liberally admitted and may take a wide range. Evidence of facts logically tending to throw light on the issue is admissible. The trial court has a large discretion.

*Watson v. Gardner*, 183 Minn. 233, 237, 236 N.W. 213, 214 (1931). We believe that in the exercise of its wide discretion, the trial court properly admitted this evidence.

3) Kvamme alleges that the special verdict form used was deficient as a matter of law because it did not set forth all of the essential elements of fraud as found in *Weise v. Red Owl Stores, Inc.*, 286 Minn. 199, 202–03, 175 N.W.2d 184, 187 (1970). Trial courts in Minnesota are permitted a great deal of deference in the language used in jury instructions. *Moosbrugger v. McGraw–Edison Company*, 284 Minn. 143, 158, 170 N.W.2d 72, 81 (1969).

■■■ Kvamme claims that the form had no question about a "misrepresentation which was the inducement to sell the stock." However, inducement need not be expressly found if it is proved that the person defrauded acted in reasonable reliance upon the falsehood. *See Berryman v. Riegert*, 286 Minn. 270, 277, 175 N.W.2d 438, 440 (1970). Therefore, the trial court was not required to give the jury a question using the word "inducement" so long as the jury found that Emlyn Jones sold his stock in reasonable reliance on Kvamme's misrepresentations.

■■■ Kvamme claims that the verdict did not establish proximate cause. In a rescission action it is not necessary to prove that pecuniary damage was proximately caused by the sale.

> One who seeks to rescind * * * because of the fraud * * * is not required to prove he was damaged in order to sustain his right to a rescission. It is enough that he did not get in substance what he was promised * * *. It is not a question of adequate value, but one of substantial compliance * * *.

*Gaetke v. The Ebarr Co., Inc.*, 195 Minn. 393, 401, 263 N.W. 448, 452 (1935).

■■■ 4) Kvamme claims the trial court erred in submitting the issue of punitive damages to the jury. However, the Minnesota Supreme Court has long held that punitive or exemplary damages may be awarded for fraud.

> [I]f it appears from the evidence that the act complained of was wanton, malicious, *fraudulent*, or oppressive, and such as to show a reckless disregard of the rights of the plaintiff, the jury may in its discretion, award exemplary damages.

*Anderson v. Int'l Harvester Co.*, 104 Minn. 49, 51, 116 N.W. 101, 102 (1908) (emphasis added). Generally, punitive or exemplary damages are granted "only for conduct which is malicious, willful or in reckless disregard of the rights of others." *Huebsch v. Larson*, 291 Minn. 361, 364, 191 N.W.2d 433, 435 (1971). However, punitive damages have been upheld in the absence of malice, where the evidence simply showed willful disregard for the rights of others. *Wilson v. City of Eagen*, 297 N.W.2d 146, 151 (Minn.1980). Therefore, the trial court had ample authority to submit the question of punitive damages to a jury in a case of an intentional fraud. The decision on whether punitive damages are appropriate under the pertinent facts of a case is within the discretion of the jury. *Huebsch v. Larson*, 291 Minn. 361, 364, 191 N.W.2d 433, 435 (1971).

■■■ Kvamme argues that the jury instructions on punitive damages should have included the "clear and convincing evidence" standard of proof under Minn.Stat. § 549.20, subd. 1 (1978). We cannot agree. Section 549.20 has an effective date of April 15, 1978, to apply "to all causes of action arising on or after that date." 1978 Minn.Laws, ch. 738, § 11. Although the fraud was discovered in 1980 after the enactment of section 549.20, the cause of action as found by the trial court arose in 1967 and, therefore, the language of the statute itself indicates that it is inapplicable. We note, further, that the trial court's determination that the cause of action arose in 1967 is supported by case law. In *Wilson* the supreme court stated:

> [T]he standard of review and the law to be applied is that developed in the prior decisions of this court and not that of Minn.Stat. § 549.20 (1978), because the *events* in this case occurred before the effective date of the statute.

*Wilson*, 297 N.W.2d at 150 n. 3. The events of this case occurred in 1967. Although the discovery of the cause of action is determinative of statute of limitation issues, that discovery date does not trigger applicability of section 549.20.

## IV.

In explaining the basis upon which rescissionary damages were awarded to respondent, the trial court observed:

[R]estitutionary compensation in place of that of which the seller has been defrauded is appropriate. * * * Otherwise the fraudfeasor is enabled to profit by his wrongful act while the victim, *who would have kept the property but for the fraud practiced upon him,* can neither regain what he parted with nor the on-going benefit of it of which he has been deprived.

Kvamme argues that the court erred in adopting the rescissionary measure of damages and should have applied the "out of pocket" rule for measuring fraud damages, which

allows damages to be recovered which are the natural and proximate loss sustained by a party because of reliance on a misrepresentation. Under this rule it is not a question of what the plaintiff might have gained through the transaction but what was lost by reason of defendant's deception. * * * The loss is usually measured as the difference between what plaintiff parted with and what he received.

*Lewis v. Citizens Agency of Madelia, Inc.,* 306 Minn. 194, 200, 235 N.W.2d 831, 835 (Minn.1975). If this rule were applied, Blume's damages would be limited to $125,-000, the value of the stock when it was sold.

This action was pled and tried on the basis of rescission as a consequence of fraud. Blume sought restitution, not compensatory damages. The Minnesota Supreme Court has long recognized that the measure of damages for fraud must be flexible and construed in light of the facts of each case. *Wallace v. Hallowell,* 56 Minn. 501, 508, 58 N.W. 292, 294 (1894). The court "has been flexible in the past where the strict application of an out of pocket damage rule would fail to do substantial justice." *Jensen v. Peterson,* 264 N.W.2d 139, 143 (Minn.1978).

In *Hughes v. Sinclair Marketing, Inc.,* 389 N.W.2d 194, 199 (Minn.1986), the court affirmed an award of lost future profits, stating:

The purpose behind limiting damages for common law misrepresentation to out-of-pocket loss is to avoid speculative damages and assure that the award is measured by the natural and proximate loss sustained by the defrauded party. * * * The court has recognized an exception to the general rule when out-of-pocket damages fail to return a party to the status quo.

The trial court relied on two securities law cases from the ninth and first circuits which do not involve common law fraud; however, they are rescission actions and they do demonstrate ways in which a wrongdoer is prevented from profiting by his wrongful act.

In *Nelson v. Serwold,* 576 F.2d 1332, 1338 (9th Cir.1978), *cert. denied* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978), stock with a book value of $60 per share was purchased for $6.94 per share due to the purchaser's material omissions. Six years later, when the fraud was discovered, the stock's value had risen to $500 per share. In that rescission the court rejected strict application of the "out-of-pocket" rule, stating:

The early cases generally awarded the difference between the value given and the value received, but the recent trend looks to defendant's profits, rather than to plaintiff's losses, in measuring damages. * * *

This rule provides full compensation for injury caused by fraudulent conduct, and, significantly, it removes all incentive to engage in such conduct.

*Id.*

In *Janigan v. Taylor,* 344 F.2d 781 (1st Cir.1965), *cert. denied* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), stock fraudulently purchased for $40,000 was sold two years later for $700,000. The court held:

[I]t is simple equity that a wrongdoer should disgorge his fraudulent enrichment.

*Id.* at 786. However, the *Janigan* court acknowledged that it might be speculative whether, had the sale not occurred, the series of fortunate events would have occurred to the same profit. Nevertheless, the court reasoned "it is more appropriate to give the defrauded party the benefit of windfalls * * *." *Id.*

The *Janigan* court delineated the limits to which the disgorgement principle was subject:

> If an artist acquired paints by fraud and used them in producing a valuable portrait we would not suggest that the defrauded party would be entitled to the portrait, or to the proceeds of its sale.

*Id.* at 787.

In an eighth circuit case, *Rude v. Campbell*, 411 F.Supp. 1040 (D.S.D.1976), the court construed the primary limitation of the disgorgement rule in *Janigan* as arising

> in the situation where the defendants' gains have been realized largely through his or her own special efforts to such an extent that it would be unjust to award them to a plaintiff.

*Id.* at 1050.

Cecil Jones established Kato in 1928. Kvamme did not join the company until about 1956, *after* Kato's huge growth during the war years. His position of power in the company did not occur until the final years before Cecil died and Kato was sold. In this long view, Kato's worth doesn't appear to be realized substantially through Kvamme's efforts, and therefore the limitation recognized in *Janigan* and *Rude* is inapplicable.

The *Nelson* court said:

> [W]e see no harshness in a remedy which takes from a fraudulent actor what was generated by his conduct.
>
>     \*    \*    \*    \*    \*    \*
>
> Only in this manner can the seller be put in the position he occupied before the contract was made.

*Nelson*, 576 F.2d at 1339–40. Accordingly, we believe the trial court applied the proper measure of damages.

## V.

Kvamme argues that the trial court erred by refusing to grant his motion for a new trial pursuant to Minn.R.Civ.P. 60.02 on the basis of newly discovered evidence.

■■■ Motions for a new trial based on newly discovered evidence "should be granted cautiously and sparingly in the furtherance of substantial justice." *Leuba v. Bailey*, 251 Minn. 193, 208, 88 N.W.2d 73, 83 (1957). The losing party is required to prove that the newly discovered evidence "could not have been discovered" before trial by the exercise of due diligence. *Vikse v. Flaby*, 316 N.W.2d 276, 284 (Minn. 1982). The new evidence must not be merely "cumulative, contradictory or impeaching." *Swanson v. Williams*, 303 Minn. 433, 435, 228 N.W.2d 860, 862 (1975).

> [I]t must appear that the newly discovered evidence is such that it probably will lead to a different result in a new trial.

*Bruno v. Belmonte*, 252 Minn. 497, 503, 90 N.W.2d 899, 903 (1958).

■■■ Kvamme's counsel claims to have discovered a new witness, Alvin Reed, a Kato employee from 1950 to 1980. According to Reed's affidavit, he spoke with Emlyn Jones on a daily basis and claims Emlyn told him many times that he sold the stock to Kvamme personally. Kvamme's counsel claims Reed was previously unknown to him. However, the record disclosed that Reed's name and address were on an exhibit list of individuals who played a significant part in Kato's management. Reed was also remembered in Cecil Jones' will and counsel's law firm represented Reed along with others in a controversy connected to the will's probate. The trial court found that counsel had a "threshold inquiry of him," yet made no effort to contact him.

The trial court also held it was unclear that Reed's contradictory testimony would produce a different outcome and that no such probability had been shown.

On review "this court need only determine whether the trial court's refusal to [grant the motion] involved the violation of a clear legal right or a manifest abuse of

judicial discretion." *Regents of University of Minnesota v. Medical Inc.*, 405 N.W.2d 474, 478 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. July 15, 1987), *cert. denied* — U.S. ——, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987). No abuse is in evidence here.

### DECISION

Affirmed.